UNITED STATES of America, Appellee,

v.

Domingo LaBoy CRUZ, Defendant,

Maximino Bonifacio, also known as Nery, Defendant–Appellant.

No. 108, Docket 91–1456.

United States Court of Appeals,
Second Circuit.

Argued Sept. 21, 1992.

Decided Dec. 21, 1992.

Gaspar M. Castillo, Jr., Albany, NY, for defendant-appellant.

Donald T. Kinsella, Asst. U.S. Atty., Albany, NY (Gary L. Sharpe, U.S. Atty. N.D. New York, of counsel), for appellee.

Before: VAN GRAAFEILAND, WINTER and MAHONEY, Circuit Judges.

WINTER, Circuit Judge:

Maximino Bonifacio appeals from his conviction by a jury before Judge Cholakis for conspiracy to possess cocaine with the intent to distribute in violation of 21 U.S.C. § 846 (1988), and for possession of cocaine with the intent to distribute and for distribution in violation of 21 U.S.C. § 841(a)(1) (1988), and 18 U.S.C. § 2 (1988). We reverse on the ground that expert testimony was improperly admitted. This testimony concerned the behavior of drug dealers from the Albany area seeking drugs from the Washington Heights area of New York City, and the modus operandi of drug trafficking rings in that area, including the role of a "broker" and the ethnicity of the area. Because the testimony was designed to bolster the credibility of a government fact-witness by mirroring his version of events and injected the ethnicity of Bonifacio as evidence of criminal conduct, we reverse.

## BACKGROUND

The government sought to prove that Bonifacio had acted as a "broker" between Domingo LaBoy, a drug dealer in the Albany area, styled by the parties as the "Capital District," and suppliers located in the Washington Heights area of Manhattan. The government's case was based largely upon the testimony of Juan Baez, a government informant, and LaBoy. Baez testified that, on November 13, 1990, he bought two ounces of cocaine from LaBoy in Albany and that, approximately one week later,

he accompanied LaBoy to "the Dominican's house" where the three of them discussed the purchase of seven or eight ounces of cocaine. Bonifacio asked Baez if he wanted to go to New York, but Baez declined. Bonifacio then made a call on a pay phone and reported back that "everything was ready in New York." The following day, Baez again met LaBoy and purchased seven ounces of cocaine. Baez did not learn the identity of "the Dominican" until trial, when he identified Bonifacio. (During Baez's testimony, both he and the prosecutor referred to Bonifacio as "the Dominican.")

LaBoy testified that, subsequent to Baez's first approach, he and Bonifacio traveled to New York to purchase cocaine on five occasions. Each transaction was conducted in a similar manner. According to LaBoy, he and Bonifacio would travel to West 184th Street in Manhattan to meet a person known to Bonifacio. This person would take them upstairs to an apartment where two others would be waiting. Bonifacio would tell them the quantity of drugs they were seeking, and one of the men would then leave the apartment, returning approximately fifteen minutes later with cocaine. Generally, Bonifacio would check the cocaine and help count the money. After returning to the Capital District, LaBoy would meet alone with Baez to transfer the drugs.

The last witness for the prosecution was Special Agent Marano. Marano testified both as a fact-witness (regarding Bonifacio's arrest) and as an expert witness. Marano's expert testimony described typical drug trafficking operations in the Washington Heights area and the function of a broker in drug trafficking between Washington Heights and the Capital District. Bonifacio's trial counsel objected to the testimony as irrelevant. We quote the pertinent portions of Marano's direct testimony at some length:

Q  Let me ask you this, Special Agent Marano: Have you ever worked in New York City?

A  I spent ten years working in the New York City Office of the DEA.

Q  And are you familiar with 184th and St. Nicholas Avenue in Manhattan?

A  I am.

Q  What particular neighborhood is that?

A  It's a neighborhood that is surrounded by high-rise multi-family dwellings. It is what I would describe, especially to someone from the Capital District, as a tremendously overpopulated neighborhood.

Q  Does it have a name?

A  Washington Heights, Fort Washington area. Washington Heights area. It's just north of the George Washington Bridge. And as of the last five to ten years, it has become inundated with drug dealing.

\*      \*      \*      \*      \*      \*

Q  In the course of your work, have you been involved in a number of investigations, even recently, into the way drug selling or cocaine selling operations are run in New York City, particularly in the Washington Heights or Fort Washington area?

A  Yes, I have. It's a much more complex procedure. In that particular area, which does have a very high Hispanic population—by Hispanic, I mean people from Spanish speaking countries or territories, Puerto Rican people, Colombian people, Dominican, Nicaraguan, Honduran, for example.

Cocaine entrepreneurs from all over the state, people who want to make a buck in cocaine, will be brought to a dealer in Manhattan by what we call a broker or middleman. So, for example, an entrepreneur or dealer from Troy or Schenectady would travel to the New York City area, particularly the area under discussion, the Washington Heights, discuss and meet a wholesaler. A cocaine wholesaler. They negotiate a deal. When the deal is struck, the wholesaler will have someone bring the cocaine to that individual and that individual will bring the cocaine back up to the Capital District.

Now the person from the Capital District very often will never go to the exact

locations, the apartment, where the cocaine is being kept. It is a very complex series of steps to get the cocaine from where it is being hidden to the customer. Because these dealers have learned over many years and over many arrests that the more difficult, the more complex they make it for the police to find the cocaine, the longer they can keep the cocaine in their possession and away from the police. So the cocaine may be stored in one of a thousand apartments in a multi-apartment complex scenario....

Q When the person from the Capital District is brought to an apartment in this particular area, could you tell us how that person comes into—makes the exchange of money for drugs?

A The individual that comes down from the Capital District is usually brought down by a broker, as I've said. The broker will beep that someone, the wholesale cocaine dealer, by calling up that man's beeper. That man, the cocaine dealer, will then call back the broker at a telephone number that is programmed into his beeper. They will arrange a location at which to meet and there the negotiations will transpire. Most of the time the people involved, even though they may have been dealing this way for a number of months, even years, will not actually know the other individual's identity. They may know each other under pseudo names or street names like Gotco or Sneakers or Curly or something like that. This is so they can better insulate themselves from arrest.

In summation, the government relied upon the quoted testimony. We quote the pertinent portions of that summation:

Where does Mr. Bonifacio, the defendant here, come into this case? And that's the obvious question and that's the question that you have to answer. You heard Special Agent Marano testify about how drug operations are run in this particular area, our area here in the Capital District. The people will go down to New York, they will obtain various quantities of cocaine and then it will be packaged in amounts that allow them to either resell to other dealers or sell to users.... The

cocaine is obtained in New York City, and Special Agent Marano described for you the way that the cocaine dealing operations work in the northern section of Manhattan, Washington Heights, Fort Washington area, that would include the vicinity of 184th Street and St. Nicholas Avenue. And he described how people are brought by a broker from this area down to the area, because the person from up here does not know the people in New York. The people in New York are only going to, obviously, deal with people they know. The person they know brings the customer from up here to an apartment where the person sits, where the transaction is negotiated. The people leave the apartment, go to an intermediate location, as Special Agent Marano described it, obtain the cocaine where it's hidden—or they go to the area where it is stashed, bring it to the location where the buyer is, where they only have to give the buyer the amount he is buying. So if there is police involvement, they're insulated. Their main stash is insulated. The buyer is sitting in the apartment, he or she does not know where the person has gone from the apartment in order to get the cocaine from the stash. And that is precisely what Domingo LaBoy described to you as what Mr. Bonifacio was doing with respect to him.

Domingo LaBoy. There is no proof he had any connection in New York City. He was brought to the city by Mr. Bonifacio, he was taken to 184th Street, he was taken up to a fourth floor apartment. They sat in the apartment, the person left the apartment, came back with the cocaine, money was paid, Mr. Bonifacio and the other guy weighed it, looked at it to check it out to make sure it was okay, good stuff, the money was counted and they left with the cocaine and went back to Troy and sold it. And that is precisely what Mr. Bonifacio's role is in this case. It's just how Special Agent Marano described how the operations work. If you use your common sense and think about it, it is a perfectly

logical way for a person to run a business like that in order to insulate themselves....

Bonifacio took the stand and testified that he never had discussions with LaBoy or Baez concerning the buying or selling of cocaine. He stated that LaBoy was an auto mechanic and their meetings concerned automobile repairs, specifically the replacement of his car's brakes. Bonifacio testified that he had traveled with LaBoy to New York City only once, in separate cars, because LaBoy and Tomas Santos asked Bonifacio to follow them because they were worried about car trouble. Bonifacio testified that on that occasion he left the others at 191st Street and Riverside Drive, from which LaBoy and Santos continued on to an unknown destination.

## DISCUSSION

■ Although the evidence was legally sufficient to convict Bonifacio, the government's case to the jury was heavily dependent upon the credibility of LaBoy's testimony concerning trips to New York with Bonifacio.

Fed.R.Evid. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Because the district court has broad discretion regarding the admission or exclusion of expert testimony, we may overturn the exercise of that discretion only where the decision is "manifestly erroneous." *United States v. Tutino*, 883 F.2d 1125, 1134 (2d Cir.1989) (citation omitted), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990). We find such error here.

On appeal, the government argues that Marano's testimony was necessary to assist the jury because LaBoy's testimony as to the use of intermediaries or brokers was "beyond the knowledge or understanding of an average juror from the Capital District." *See* Brief of Appellee at 11. We find that a doubtful proposition. That drug traffickers may seek to conceal their identities by using intermediaries would seem evident to the average juror from movies, television crime dramas, and news stories. Indeed, in telling slips of the tongue, the government's summation stated that it was "obvious[ ]" that drug suppliers would not deal with unknown persons, in this case LaBoy, and that it was "common sense" and "logical" that they would use a known intermediary, in this case Bonifacio.

Moreover, at no time did the defense attempt to cast doubt on LaBoy's testimony on the ground that the trips to Washington Heights or events occurring there were improbable descriptions of drug transactions. Nor did the defense suggest that Bonifacio's presence at the drug transactions had an innocent explanation. Rather, the defense was that Bonifacio was not present at the drug transactions and that LaBoy had falsely accused Bonifacio as a means of bargaining with the government for a lenient disposition of his own case. Given the evidence and contentions of the parties, the dispositive factual issue was whether Bonifacio was present at the drug transactions. If so, his guilt would follow as night follows day. The role of a broker, therefore, however obvious or not to the average juror, was simply not an issue that the parties disputed.

Of course, one might speculate that the jury would, without prompting by the defense, find Bonifacio's alleged role confusing. If that concern were realistic, it would have been within the district court's discretion to admit expert testimony explaining that drug wholesalers often use intermediaries and make deliveries away from the actual locus of the drugs as means of avoiding identification and arrest. Had Marano's testimony been limited to that dry explanation of the concerns and defenses of drug traffickers, we might be inclined to affirm despite our doubts as to the need for such an explanation. The testimony, however, went into matters beyond explaining the role of a broker and

had another use that was both impermissible and prejudicial.

The government's principal use of Marano's expert testimony was, as pressed in summation, to bolster LaBoy's version of events: travel by a Hispanic drug dealer and Hispanic middleman from the Capital District to Washington Heights, an area that is inhabited by Hispanics in thousands of apartments and is a source of drugs; Bonifacio acting as broker for LaBoy; a meeting with anonymous intermediaries for the wholesaler; and the exchange of drugs for money in an apartment in which the drugs were not located. In summation, the prosecutor was thus able to argue that Marano's "testi[mony] about how drug operations are run in this particular area ... is precisely what Domingo LaBoy described to you as what Mr. Bonafacio was doing...."

■ Such reasoning, however, is exactly what we condemned as "impermissible" in *United States v. Castillo,* 924 F.2d 1227, 1231 (2d Cir.1991). In that case, as here, the government elicited testimony from an officer as to various routine acts in drug transactions—for example, the use of guns and the forcing of customers to snort cocaine to weed out undercover officers—and then argued that the defendants were guilty because the government's witnesses testified that the defendants used guns and forced an undercover officer to snort cocaine. We reaffirm here the principle that the credibility of a fact-witness may not be bolstered by arguing that the witness's version of events is consistent with an expert's description of patterns of criminal conduct, at least where the witness's version is not attacked as improbable or ambiguous evidence of such conduct.[1] First, as we stated in *Castillo,* guilt may not be inferred from the conduct of unrelated persons. *Id.* at 1234. Second, although such expert testimony logically adds nothing to the believability of a witness's account (again absent a

suggestion of implausibility), it strongly suggests to the jury that a law enforcement specialist—here an arresting officer—believes the government's witness[ ] to be credible and the defendant to be guilty, suggestions we have previously condemned. *See United States v. Scop,* 846 F.2d 135, 139–43 (2d Cir.1988); *see also United States v. Young,* 745 F.2d 733, 766 (2d Cir.1984) (concurring opinion), *cert. denied sub nom. Myers v. United States,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985).

This case is thus distinguishable from *United States v. Brown,* 776 F.2d 397 (2d Cir.1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986). In *Brown,* we held that a police officer was permitted to describe a typical drug buy in Harlem, including the role of the "steerer," where the accused's defense was that he was on the scene but unaware of any drug transaction. *Id.* at 400–02. In this case, Bonifacio's defense is that he was not present at the alleged drug buys. Indeed, with the exception of one trip, he denies even being in New York City at the pertinent times. In the present situation, as noted, if the jury believed the testimony of the prosecution witnesses that Bonifacio participated in the drug buys in New York City, a conviction was inevitable. His precise role in the transaction, therefore, was not in dispute.

The prejudicial effect of Marano's testimony is not seriously denied by the government. The testimony was thus relied upon heavily in the government's summation, which emphasized the similarities between LaBoy's testimony and Marano's description of typical drug transactions, to bolster the credibility of LaBoy's testimony.

Finally, Marano's description of the ethnicity of the area in Manhattan in which the drug transactions allegedly took place was highly improper and prejudicial. After describing the area as "inundated with

---

1. The government seeks to distinguish *Castillo* as turning on the sophistication of New York City juries regarding drug transactions. With regard to whether the testimony at issue in that case would assist a New York City jury, that sophistication may have been a factor. However, *Castillo's* holding regarding the impermissibility of using expert testimony to bolster a witness's account of events by showing consistency with patterns of criminal conduct did not depend upon the sophistication of the *Castillo* jury.

drug dealing," Marano stated that it had "a very high Hispanic population" including "Dominican[s]," this in a trial in which the principals were all Hispanic and in which the prosecutor and Baez repeatedly referred to Bonifacio as "the Dominican." Injection of a defendant's ethnicity into a trial as evidence of criminal behavior is self-evidently improper and prejudicial for reasons that need no elaboration here.

Our ruling in no way retreats from the proposition "that the operations of narcotics dealers are a proper subject for expert testimony under Fed.R.Evid. 702." *Castillo*, 924 F.2d at 1232. We hold only that the operations in question must have esoteric aspects reasonably perceived as beyond the ken of the jury and that expert testimony cannot be used solely to bolster the credibility of the government's fact-witnesses by mirroring their version of events.

Nor do we hold that expert testimony may not be used on some occasions to explain even non-esoteric matters, when the defense seeks to discredit the government's version of events as improbable criminal behavior. Where appropriate, the government may seek an agreement that such a defense will not be raised. *Cf. United States v. Figueroa*, 618 F.2d 934, 939–42 (2d Cir.1980) (Before evidence of similar crimes may be offered to prove knowledge or intent, trial judge must "determine whether the issue sought to be proved by the evidence is really in dispute.... When the Government offers prior act evidence to prove an issue, counsel must express a decision not to dispute that issue with sufficient clarity that the trial court will be justified ... in sustaining objection to any subsequent cross-examination or jury argument that seeks to raise the issue....")

We reverse. The government may, of course, seek a retrial.