**Andrew HEADLEY, Petitioner,**

v.

**Lawrence TILGHAM, Warden, CCI–Somers, Respondent.**

**No. 5:92CV00143 (TFGD).**

United States District Court, D. Connecticut.

May 17, 1994.

958

Andrew Headley, pro se.

Jack W. Fischer, Paul J. Ferencek, Office of the Chief State's Atty. Wallingford, CT, for respondent.

## RULING ON PETITION FOR WRIT OF HABEAS CORPUS

DALY, District Judge.

Petitioner Andrew Headley ("Headley") was convicted on June 4, 1990 of conspiracy to distribute narcotics with intent to sell and possession of narcotics following a jury trial in Connecticut Superior Court (Mulcahy, J.). Headley was sentenced to two concurrent twelve-year sentences. The Connecticut Appellate Court affirmed each of Headley's convictions and the Connecticut Supreme Court denied his petition for certification. *State v. Headley*, 26 Conn.App. 94, 598 A.2d 655, *cert. denied*, 220 Conn. 933, 599 A.2d 384 (1991). Headley, acting *pro se*, now seeks a writ of habeas corpus in this Court pursuant to 28 U.S.C. § 2254. Although Headley asserts several arguments in his petition, the principle issue is whether the trial court properly admitted the expert testimony of a police detective relating to (1) the evidence seized in the apartment and the practices of "drug factories" and (2) the expert's interpretation of a phone call he made in response to a call received by a pager found in Headley's possession. Headley also argues that the trial court admitted the statements made in that phone call, without a prior finding that a conspiracy existed between Headley and the caller. As Headley raised these issues in his appeal before the Connecticut Appellate Court and in his petition for certification to the Connecticut Supreme Court, he has ex-hausted his state court remedies. For the reasons stated below, the petition is granted.

## BACKGROUND

On December 15, 1987, Headley was in a Hartford apartment when it was searched pursuant to a valid warrant. Police found a large amount of cash, a handgun, small amounts of narcotics, a sifter, small plastic bags, a small hand-held scale and a triple-beam scale. A search incident to his arrest revealed that Headley had in his possession $890.00 in cash and a paging device. The three other occupants of the apartment also were arrested.

Headley was charged with possession and conspiracy to distribute narcotics with intent to sell, in violation of Connecticut General Statutes §§ 21a–278(b), 21a–277(a) and 53a–48, and the case was tried to a jury. The prosecution sought to prove that Headley was involved in large-scale drug trafficking and utilized the apartment in which he was arrested as a "drug factory" or "distribution house." The prosecution's case rested largely upon the testimony of a co-conspirator and the lessee of the apartment, Denise McCrary ("McCrary").[1] McCrary testified that in exchange for money and drugs Headley would use her apartment on occasion to distribute large amounts of cocaine. Tr. at 426–28. McCrary further testified that on his most recent visit Headley brought with him a large amount of cocaine, plastic bags, a triple-beam scale, a handgun and a pager. Tr. at 426–32. McCrary admitted that the cocaine in her handbag, a hand-held scale, another bag of cocaine with a straw, and a sifter found in her apartment belonged to her. Tr. at 429–33. She testified that the $28,000.00 in cash found in the cushions of her couch was that of another co-conspirator, David Latty. Tr. at 434. Additionally, she testified that the message she wrote on the back of an envelope in response to a telephone call for Headley was from an individu-

---

1. McCrary pleaded guilty to possession with intent to sell and conspiracy to distribute narcotics in violation of Connecticut General Statutes §§ 21a–277(a) and 53a–48. Prior to Headley's trial she was sentenced to a suspended five-year

al she believed was requesting cocaine.[2] Tr. at 439–40. McCrary's testimony and the evidence found in the apartment during the search was the only direct evidence offered by the prosecution.[3]

The prosecution also introduced Detective Michael Manzi both as a fact witness regarding Headley's arrest and as an expert witness. Manzi's expert testimony covered a broad range of issues including the drug-related use of the items found in the apartment, the relationship between the amount of money and the amount of drugs found, the characteristics of a "drug factory" or "distribution house", and his expert interpretation of the evidence presented to him. Manzi also provided both fact-related and expert testimony concerning a telephone call he made while at the police station. The paging device found in Headley's possession after his arrest displayed a telephone number from a caller. Manzi recounted to the jury the statements of the person who answered at the listed number, which the court admitted as those of an unidentified co-conspirator made in furtherance of the conspiracy. Because the substance of Manzi's testimony is vital to the Court's determination of the instant petition, it is set forth in detail below.

Manzi began by testifying generally as to his experience in narcotics enforcement and the manner in which narcotics are sold. The prosecution then directed his attention to the facts surrounding Headley's arrest.

Q. All right. Now you mentioned houses. Now, drawing your attention to house sales, or house dealing, can you describe the various ways this is done, how a house is used?

A. A house is used to—the house, itself, is used to keep the larger amount of cocaine, as to keep it from detection or apprehension of police officers. Individuals involved with this type of activity will take small amounts and keep them on their person, go out in front of this house, or even stay sometimes in the house, and deal the smaller amounts to users and anybody else who was a prospective buyer of this product.

Q. Sir, are you familiar with the term "distribution house"?

A. That's a term I've used—

Q. And what would you mean by a distribution house?

A. A distribution house, unlike other places, is where the cocaine is being stored, sold, and packaged and processed for street sale.

Q. Okay. And are the sales usually done there or at another location?

A. They're sometimes done there on the large quantities; sometimes they're done elsewhere.

Q. Okay. Drawing your attention to these type [sic] of houses—distribution houses—or a house that deals with the trafficking of narcotics, can you tell us what types of items you would expect to find?

A. Well, in these items we've always found scales, sifters, evidence used in what we've termed a drug factory, and these include those scales, drugs, sifters, monies, beepers, weapons, especially handguns, automatic-type handguns, things along that line.

Q. And did you say narcotics? I'm sorry.

A. Yes. Narcotics, too.

term of incarceration and was placed on probation.

**2.** The note, written by McCrary, read as follows: "She needs something. She will have to come and pick it up. Call after midday." McCrary testified on direct as follows:

Q. Okay. As a result of that conversation, did you feel that Pauline was telling you everything, or hiding things from you?
A. She wasn't telling me what she needed from him.
Q. Okay. Did you have an impression as to what it might be?
A. I had a [sic] idea.
Q. And what was the idea, if you know?
A. It was because—I guess she wanted some cocaine.
Q. But you don't really know. That's just—
A. I just have a [sic] idea.
Tr. at 440.

**3.** Four arresting officers also testified as to the evidence seized in the apartment and to the fact that three of the occupants appeared to be fleeing as the officers entered.

Q. Okay. Now, talking about money, is there any correlation between the amount of money you might find and the amount of narcotics you might find in a location of this nature?

A. Yes, there is.

Q. Can you tell us what that correlation would be?

A. Through my investigation, being involved with all these cases that I've conducted or assisted with, it's—excuse me—it's far and few between that we come across a location where we will seize a large amount of cocaine and a large amount of money, because the large amount of money is usually used to purchase cocaine, so, therefore, it wouldn't be in the place or distribution house; that when the cocaine is all sold, therefore, the profits become a large amount of money; therefore, you have a little bit of cocaine. So it's, I think, a very rare occasion do we ever get a large amount of money and a large amount of cocaine at the same time.

Tr. at 367–69.

After testifying at great length as to the drug-related use of the items found in the apartment, Manzi then answered hypothetical questions in his capacity as an expert witness:

Q. Now, Detective, would you expect to find items of this nature in a house that was dealing in the trafficking of narcotics?

A. Yes, I would.

. . . .

Q. Would you expect to find—well, let me withdraw that question. You mentioned that you're only aware of illegal purpose [sic] for a scale of this nature.

A. Mm-hmm.

. . . .

Q. Would you expect to find an item of this nature in a residence related to drug trafficking?

A. Yes, I would.

Tr. at 373–74, 375, 376.

Manzi further testified about the use of a handgun:

Q. And can you tell us—well, if I might strike that. Is it usual and customary to find [a handgun] of this nature in a residence related to drug trafficking?

A. Yes, it is.

Q. And for what purpose would it be there?

A. This is often used by the dealers to protect themselves from other people who might come in and attempt to rob drug houses, because street people know that large amounts of money are oftentimes kept in these houses and words pass quickly on the street as to location of drug houses, and there is a lot of money there, so it's used for that purpose. It's also used sometimes, and, hopefully, not too often, against police officers who come and try to take the cocaine and ill-gotten monies from those drug dealers.

Tr. at 378–79.

Manzi also provided his expert opinion on the meaning of the envelope seized in the apartment, as well as the meaning of the evidence as a whole:

Q. . . . Could you read the notation . . . [?]

A. The number is 583–9282; there's a name of Pauline; and then the notation under that, "She needs something. She will have to come and pick it up. Call after midday."

Q. Now, Detective, that seems to be a fairly innocent-sounding note. Now, if you take that note and put it in conjunction with the other items that you have been seeing so far, would there be some meaning to it to you, based upon your training and experience?

A. Yes, it would.

A. Can you tell us what it is?

A. That's a typical way of asking for drugs.

Q. And why would it be written so innocently?

A. Because they—it's something used by these people who think they're very brilliant to use some lay type of terminology to purchase contraband.

. . . .

Q. ... Would you have an opinion as to the trafficking activity of a residence if approximately thirty thousand dollars in cash was located there during a search?

A. Yes, I would.

Q. And what would that opinion be?

A. It would lead me to believe that we were talking about a high scale operation.

. . . .

Q. Thank you, sir. Now, Detective, taking into consideration all the items that we have gone through so lengthily, and I apologize for that, that being the narcotics, the scales, the semi-automatic handgun, the packaging materials, the notation on the envelope, the sifter, the beeper, and approximately thirty thousand dollars in cash—if those were all found in a residence, and based on your training and experience, can you come to a conclusion as to the relation of that residence to narcotics trafficking?

A. Yes, I can.

Q. And can you tell us what the conclusion would be?

A. My conclusion, through my experience, is that the apartment was used as a drug factory, and that cocaine was being distributed from that location.

Tr. at 380–81, 383, 386–87.

Finally, Manzi testified as to his interpretation of the meaning of the words spoken to him by the individual who answered at the number displayed in the pager found in Headley's possession.

Q. And can you tell us, what, if anything, you heard when that phone was answered?

A. It was a distinct Jamaican voice, a male, and the words from this male were to the effect of—and very hard to differentiate between certain words that this Jamaican voice used, but they were similar to, "Are you up? Can I come by? Are you ready?" Words to that effect.

. . . .

Q. Okay. Now, Detective, based on your training and experience, and the number of cases that you've dealt, have you had

an opportunity to deal with parlance of this nature before?

A. Yes, I have.

. . . .

Q. And in those experiences that you've had, have you heard words of this nature before?

A. Yes, I have.

. . . .

Q. Okay. Do you recall what you believed was transpiring during that phone call, in your mind, what you believed was happening?

A. Absolutely.

Q. And what was that?

A. This person on the phone wanted to purchase cocaine.

Tr. at 642, 643, 644.

The prosecution heavily relied upon Manzi's testimony in its summation. The pertinent portions are as follows:

Detective Manzi testified. He testified as an expert as well as an observer in the case in question, an expert in the area of narcotics investigations. He reviewed the evidence. He stated its connection to narcotics distribution. I believe his testimony shows that there's no doubt that that apartment was being used to distribute narcotics.

He also testified as to Mr. Headley. He's the detective who found the beeper on him and who also experienced the activation of that beeper. He also found eight hundred ninety dollars on him. Let's talk about the activation of the beeper, because I'm sure that it's a very important thing, and I know that [defense counsel] is going to mention it.

Now, I would have loved it, when Detective Manzi picked up the phone and the person on the other side said, "Hey, I need to buy some cocaine. Can I come by with about fifteen hundred dollars? I'll be by in ten minutes to pick up the cocaine." But, as the detective testified, drug trafficking is done under a secretive manner, and it's often done in a manner with slang and with innocuous words being stated, and those words were stated. He doesn't recall the exact words, but it was along the

lines of, "Are you okay? Are you up? Can I come by?" And that can be construed a whole bunch of different ways, and I won't go into them because I can almost bet [defense counsel] will give you at least seventeen different ways to construe it. But I think if you view that with your common sense, as opposed to all the other evidence, evidence found in the apartment, the fact that this gentleman was found in the apartment, the testimony of Denise McCrary, you're going to see that it was not that innocent a phone call. It was a phone call in furtherance of narcotics distribution. It was a buyer.

. . . .

And remember what Detective Manzi said. He said, "It's very rare that you find large sums of money and large sums of drugs in a location. It's either one or the other."

Tr. at 698–99, 701.

The prosecutor took the opportunity to reiterate Manzi's testimony during his rebuttal.

You'll recall that Detective Manzi said that drug dealers like to use houses rather than deal out of cars or on the street, because they have more protections. They have to get a search warrant to go into the house. They have more protections when they're in a house. They both worked together in that manner.

. . . .

This case doesn't depend alone on Denise [McCrary]. It depends a lot on Denise, but there's other evidence: [Headley's] presence actively in an active apartment concerned with distribution of narcotics, the evidence found there, the large sums of money, and the beeper and the phone call. That's strong evidence, too. God, I wish that phone call was more direct, but when you take it into consideration as to what those words meant, I think it is direct. I think it is heavy evidence.

Tr. at 727, 729–30.

Headley's attorney sought to prove during trial that the search warrant specifically targeted Denise McCrary and that Headley's only wrongdoing was his presence in the apartment when the warrant was executed.

In his petition, Headley essentially asserts that, as the methods used in drug trafficking are within the knowledge of the average juror, Manzi's expert testimony was unnecessary and prejudicial. He claims that Manzi's expert testimony only served to bolster the credibility of the state's principal witness. The petitioner also argues that Manzi invaded the province of the jury by testifying as to the ultimate issue of his guilt. The State argues in response that Manzi's expert testimony was necessary to assist the jury, and asserts that Headley's reliance on *Castillo*, *see* Mem. in Support of Pet. at 5 (citing *United States v. Castillo*, 924 F.2d 1227 (2d Cir.1991)), is misplaced. The State also argues that Manzi's testimony did not invade the province of the jury. Further, the petitioner argues that the trial court admitted the statements of the person at the telephone number displayed on the pager, as spoken to Manzi, without an adequate preliminary finding of the existence of a conspiracy between Headley and the caller.

### DISCUSSION

A state prisoner is entitled to habeas relief under 28 U.S.C. § 2254 if he is being held in custody in violation of a federal right. *Engel v. Issac*, 456 U.S. 107, 119, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1982). In general, evidentiary issues are controlled by state law, and the mere erroneous application of state law is insufficient to constitute a denial of due process under the Federal Constitution. *Id.* Rather, such errors must violate the petitioner's right to a fair trial. *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir.) ("Erroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus. Rather, the writ would issue *only* where the petitioner can show that the error deprived [him] of a *fundamentally fair* trial.") (emphasis in original), *cert. denied*, 464 U.S. 1000, 104 S.Ct. 503, 78 L.Ed.2d 694 (1983).

If a reviewing court finds that an evidentiary ruling deprived the defendant of a fair trial, the court must then determine whether that error was harmless. Prior to the Supreme Court's decision in *Brecht v.*

*Abrahamson,* — U.S. —, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), a writ of habeas corpus would be granted unless the court was persuaded that a constitutional error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). In *Brecht,* however, the Supreme Court held that the harmless-error standard set forth in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and not that of *Chapman,* must be applied. *Brecht,* — U.S. at —, 113 S.Ct. at 1722. According to the *Kotteakos* standard, habeas relief must be denied unless the error "had substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States,* 328 U.S. at 776, 66 S.Ct. at 1253 (1946). Thus a habeas corpus petition alleging trial error will not be granted unless the petitioner can establish actual prejudice. *Brecht,* — U.S. at —, 113 S.Ct. at 1722.

▰ Establishing actual prejudice requires the Court to enter the minds of the jurors to decide if, in fact, the erroneously admitted evidence swayed their decision. The *Kotteakos* Court provided a guideline to help with this determination:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand.... But if one cannot say, with fair assurance, after pondering all that happened without

stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Kotteakos,* 328 U.S. at 764–65, 66 S.Ct. at 1247–48. Finally, in making this determination "[t]he strength of the prosecution's case is probably the single most critical factor in determining whether error was harmless." *United States v. Castano,* 999 F.2d 615, 618 (2d Cir.1993); *see also Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986); *United States v. Colombo,* 909 F.2d 711, 714 (2d Cir.1990).

## A. Introduction of Expert Testimony

▰ Turning to the facts of this case, the first issue under consideration is whether the trial court properly admitted Manzi's expert testimony. After hearing the prosecution's offer of proof and the arguments of counsel on the issue, the trial court overruled the defendant's objection to the proffered testimony.[4] Further, on appeal the Appellate Court of Connecticut deferred to the trial court's discretion and concluded that *Castillo* did not control.[5]

---

4. Defense counsel made the following objection in opposition to Manzi's testimony:

   [Defense Counsel]: Your Honor, the thrust of my objections will be this. Essentially, what the State is attempting to do is put on an expert to say that Andrew Headley is guilty. Now, along the lines of *State versus Apostles* and other cases, they were asking an expert to invade the province of the jury. There have been cases, *Vilalastro* [sic] and others, that say when the jury needs expert opinion, that that province of the jury may be encroached upon to a limited extent, but it's only a situation where they need expert testimony. I think the jury is fully capable of recognizing this is cocaine, these are scales, and so forth, and to have an expert come in and buttress that by saying, "Yes, it must have been a drug-trafficking location," really goes beyond the intent of *Villalastro,* which addresses specific technical evidence coming from an expert.

   Tr. at 320–21. Defense counsel preserved this objection throughout Manzi's testimony. Al-

though *Castillo* was decided after the date of Headley's trial, the grounds argued in support of this objection are identical to the *Castillo* holding. *See infra* p. 964.

5. The appellate court held that:

   Manzi's testimony regarding narcotics trafficking methods was related both to the specific crime charged and to the environment necessary to conduct a narcotics operation. Moreover, it was not cumulative of prior testimony. We, therefore, conclude that *Castillo* and [*United States v.*] *Long* do not control, and defer to the trial court's broad discretion.

   *State v. Headley,* 26 Conn.App. 94, 598 A.2d 655, 656–57 (1991). As *Castillo* was decided on February 4, 1991, and Headley's conviction became final on November 22, 1991, the application of the holding in *Castillo* to the instant petition does not constitute an impermissible retroactive application of a new rule. *See Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

■ Expert testimony to explain the operation of narcotics dealers may properly be admitted when that testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Castillo,* 924 F.2d at 1232. *Castillo* involved the decision of a trial court to admit the expert testimony of a detective who related the "purported methods of Washington Heights drug dealers." *Id.* at 1231.[6] While acknowledging that in certain circumstances such expert testimony is appropriate, the Court stated that

> [W]e are not convinced that New York jurors in today's climate, flush with daily news of the latest drug bust, need an expert to enlighten them as to such elementary issues as the function of a scale or index card in a drug deal.

*Id.* at 1233 (citing *United States v. Long,* 917 F.2d 691, 702 (2d Cir.1990)). The Court found that the testimony of the undercover officer who had testified as to the events surrounding the arrest provided sufficient information to explain the use of drug paraphernalia items. *Id.* Accordingly, the Court held that such expert testimony must be limited to situations "where the subject matter of the testimony is beyond the ken of the average juror." *Id.* (citation omitted); *see also United States v. Brown,* 776 F.2d 397, 400 (2d Cir.1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986); *United States v. Young,* 745 F.2d 733, 760 (2d Cir.1984); *United States v. Carson,* 702 F.2d 351, 369 (2d Cir.) *cert. denied sub nom. Thomas v. United States,* 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1335 (1983); *United States v. Nersesian,* 824 F.2d 1294, 1308 (2d Cir.) *cert. denied,* 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987).

Likewise, in *United States v. Cruz,* 981 F.2d 659 (2d Cir.1992), the Court condemned the use of an expert witness to testify about the behavior of drug dealers.[7] *Id.* at 659. The Court held that the government's purpose in offering expert testimony on matters reasonably within the knowledge of the average juror was to "bolster" the testimony of the only other witness to testify about the actual drug transactions. *Id.* The Court stated:

> We reaffirm here the principle that the credibility of a fact-witness may not be bolstered by arguing that the witness's version of events is consistent with an expert's description of patterns of criminal conduct.... [A]lthough such expert testimony logically adds nothing to the believability of a witness's account ..., it strongly suggests to the jury that a law enforcement specialist—here an arresting officer—believes the government's witness to be credible and the defendant to be guilty, suggestions we have previously condemned.

*Id.* at 663 (citing *Castillo,* 924 F.2d at 1231). Manzi's expert testimony constitutes exactly the type of evidence found impermissible in *Castillo* and *Cruz.*[8] As pointed out in *Castillo,* drug traffickers' methods of operation are hardly unknown to the average juror.[9] Manzi's testimony therefore was admitted erroneously.

■ The question remains whether the improper admission of Manzi's expert testimony "had substantial and injurious effect or influence in determining the jury's verdict," *Brecht,* —— U.S. at ——, 113 S.Ct. at 1722, and in this analysis the strength of the prosecution's case "is probably the single most critical factor in determining whether

**6.** The challenged expert testimony concerned the use of items such as "scales, tinfoil, plastic sandwich bags, plastic playing cards and guns" in drug transactions. *Castillo,* 924 F.2d at 1231.

**7.** The expert, a DEA agent, also testified as a fact witness. *Cruz,* 981 F.2d at 660.

**8.** Manzi often had difficulty remembering the capacity in which he was testifying. He repeatedly referred specifically to cocaine in response to the prosecutor's general questions about narcotics. Moreover, when asked for his expert opinion about the function of a *residence*

in which items identical to those seized were found, Manzi responded: "My conclusion, through my experience, is that the *apartment* was used as a drug factory...." Tr. at 387 (emphasis added).

**9.** Statements made by the prosecutor throughout his summation draw into question whether an expert was needed at all, as the prosecutor repeatedly asked the jurors to use their own common sense as it related to the evidence. *See supra* pp. 961–962; *see also Castillo,* 924 F.2d at 1233.

error was harmless." *United States v. Castano*, 999 F.2d 615, 618 (2d Cir.1993). As in *Cruz* the prosecution offered only one witness other than the expert to link Headley either to the physical evidence presented or to large-scale drug trafficking: Denise McCrary. McCrary, who was the target of the search warrant, pleaded guilty prior to Headley's trial and received a suspended sentence. *See supra* note 1. At trial she admitted to owning the only cocaine found in the apartment as well as the small scale and sifter. The prosecutor relied substantially on Manzi's testimony in his summation to support McCrary's testimony. It can be inferred from the prosecutor's remarks during his rebuttal argument that McCrary's credibility was the central issue in the case.[10] Indeed, the prosecutor's substantial reliance on Manzi's expert testimony to bolster McCrary's credibility demonstrates that, in the absence of such support, McCrary simply was not a believable witness. As stated in *Cruz*, use of this type of expert testimony "strongly suggests to the jury that a law enforcement specialist—here an arresting officer—believes the government's witness to be credible and the defendant to be guilty...." *Id.* at 663. The Second Circuit in *Castillo*, faced with strikingly similar facts, determined that such testimony constituted reversible error. *Castillo*, 924 F.2d at 1233.[11] The same result pertains here, and accordingly the Court finds that the admission of Manzi's testimony had a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos*, 328 U.S. at 776, 66 S.Ct. at 1253.

**B. Introduction of Statements of Co-Conspirator**

■ Headley also argues that the trial court improperly admitted the statements of the speaker at the number called by Manzi as an unidentified co-conspirator. *See supra* p. 961. In particular, Headley argues that the trial court admitted these statements in the absence of an adequate preliminary finding of the existence of a conspiracy between the speaker and Headley.

The speaker's statement was offered for its truth, and it therefore constituted hearsay. *See Acampora v. Ledewitz*, 159 Conn. 377, 381, 269 A.2d 288 (1970); *see also* Fed. R.Evid. 801. Defense counsel objected to the statement's admission on the ground that the court had made no prior finding of the existence of a conspiracy. Defense counsel also argued that even if the court found a conspiracy to have existed, the conspiracy had ended at the time of Headley's arrest. Tr. at 621–22. Addressing only the issue of whether the conspiracy had ended at the time of the call, the trial court found that it had not and thus admitted Manzi's testimony of the statement. Tr. 623–24. The trial court made no independent finding as to the existence of a conspiracy between Headley and the caller. The Connecticut Appellate Court affirmed the trial court's finding as to the termination of the conspiracy, *see State v. Headley*, 26 Conn.App. at 99, 598 A.2d at 657, and likewise failed to consider the speaker's participation in any conspiracy with Headley.

■ Under both state and federal law, in order to admit the statements of a co-conspirator there must be evidence (1) that a conspiracy existed, (2) that it was still in existence at the time the statement sought to be admitted was made, (3) that it was made in furtherance of the conspiracy and (4) that both the declarant and the defendant were participants in it. *See Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987); *United States v. Maldonado–Rivera*, 922 F.2d 934, 958 (2d Cir.1990), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991); *State v. Vessichio*, 197 Conn. 644, 654–55, 500 A.2d 1311 (1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986). The trial court's general determination of the existence of a conspiracy was supported only by

10. For example, the prosecutor stated: "Again, I mean, with all due respect to Denise, she's not—she's not a sharp attorney. She's just a person who is under an incredible amount of pressure." Tr. at 731.

11. It is noteworthy that *Castillo*, although decided on direct review, also involved an application of the *Kotteakos* standard. *See Castillo*, 924 F.2d at 1233.

**966**

evidence of an agreement between Headley and McCrary, and the only evidence that could possibly support the finding of a conspiracy between Headley and the unidentified caller was Manzi's testimony on his opinion of the meaning of the caller's statements. *See supra* p. 961. As concluded above, however, Manzi's testimony was admitted improperly. Even had its admission been otherwise proper, the testimony would be insufficient to support a finding of a conspiracy. Moreover, the trial court made no independent finding of the existence of a conspiracy between Headley and the caller. Finally, while the presence of the telephone number on Headley's beeper suggests the possibility of a relationship between Headley and the caller, such a suggestion alone cannot support a finding that the caller's statements were supported by "sufficient indicia of reliability." *United States v. Paone*, 782 F.2d 386, 391 (2d Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986) and 483 U.S. 1019, 107 S.Ct. 3261, 97 L.Ed.2d 761 (1987). The admission of the caller's statements therefore violated Headley's rights under the Confrontation Clause of the Sixth Amendment. *See id.* at 390–91; *see also Bourjaily*, 483 U.S. at 181–83, 107 S.Ct. at 2781–83.

▮ The admission of the caller's statements also had a substantial and injurious effect on the jury's verdict, as the statements constituted significant evidence supporting the State's theory that Headley was engaging in drug distribution. Accordingly, as the admission of the statements resulted in "actual prejudice," *see Brecht*, —— U.S. at ——, 113 S.Ct. at 1722, such admission constitutes a second and independent ground on which to grant Headley's petition.

### CONCLUSION

For the reasons stated above, Headley's petition for a writ of habeas corpus is hereby GRANTED unless the state provides the petitioner a new trial within 120 days of the date of this Ruling.

SO ORDERED.