**Andrew HEADLEY, Petitioner–Appellee,**

**v.**

**Lawrence TILGHMAN, Warden, Connecticut Correction Institution—Somers, Respondent–Appellant.**

**No. 1257, Docket 94–2455.**

United States Court of Appeals, Second Circuit.

Argued March 24, 1995.

Decided April 13, 1995.

Jack W. Fischer, Asst. State's Atty., Appellate Unit Office of the Chief State's Atty., Wallingford, CT, for respondent-appellant.

Jeremiah Donovan, Old Saybrook, CT, for petitioner-appellee.

Before: McLAUGHLIN and JACOBS, Circuit Judges, and KAUFMAN, District Judge.[*]

McLAUGHLIN, Circuit Judge:

Andrew Headley was charged with possession of narcotics with intent to sell and conspiracy to distribute narcotics, in violation of Conn.Gen.Stat. §§ 21a–278(b), 21a–277(a) and 53a–48(a) (1988). At trial, a jury convicted Headley on both counts. The trial court sentenced him to concurrent twelve-year prison terms for the narcotics convictions.

The Connecticut Appellate Court affirmed Headley's convictions and the Connecticut Supreme Court denied his petition for certification. *State v. Headley,* 26 Conn.App. 94, 598 A.2d 655, *cert. denied,* 220 Conn. 933, 599 A.2d 384 (1991). Headley then petitioned the United States District Court for the District of Connecticut (T.F. Gilroy Daly, *Judge* ) for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. The district court granted

the petition, holding that the Connecticut trial court had improperly admitted (1) expert testimony of an arresting officer, and (2) statements made by an unidentified co-conspirator during a telephone call. The district court found that these errors had a substantial and injurious effect on the jury's verdict.

The Warden of the Connecticut Correctional Institution at Somers (the "Warden") appeals, arguing that the trial court properly admitted both the expert testimony and the statements made by the unidentified co-conspirator. We agree, and accordingly, reverse and remand with directions to deny the habeas petition.

## BACKGROUND

In late 1987, Connecticut police officers searched Denise McCrary's apartment in Hartford, Connecticut pursuant to a valid search warrant. They seized close to $30,000 in cash, a handgun, and small amounts of cocaine and marijuana. In addition, they seized items consistent with drug dealing including a sifter, small plastic bags, a small hand-held scale, and a triple-beam scale. The officers arrested the defendant, Denise McCrary, and two others who were in the apartment at the time of the search. Detective Michael Manzi, a narcotics officer for the Hartford police department, searched Headley incident to the arrest and found $890 in cash and a beeper.

At the police station, while Manzi was processing the evidence, Headley's beeper was activated by an incoming call. Manzi called the number displayed on the beeper screen, and a man with a Jamaican accent answered, saying "Are you up? Can I come by? Are you ready?" When Manzi began to speak, the unidentified man hung up.

Headley was charged with possession of narcotics with intent to sell and conspiracy to distribute narcotics in violation of Conn.Gen. Stat. §§ 21a–278(b), 21a–277(a) and 53a–48(a). On the eve of his trial, Headley fled the jurisdiction. He was recaptured five months later, and pled guilty to failure to

[*] Honorable Frank A. Kaufman, of the United States District Court for the District of Maryland, sitting by designation.

appear in the first degree, in violation of Conn.Gen.Stat. § 53a–172(a) (1988). At his jury trial on the drug charges, the state called Detective Manzi and Denise McCrary, who had pled guilty to possession with intent to sell and conspiracy to distribute narcotics, and had been sentenced to a suspended five-year sentence.

Manzi testified as both a fact witness regarding Headley's arrest and as an expert on narcotics investigations. In his capacity as an expert, Manzi stated his opinion concerning the drug-related use of the items seized in McCrary's apartment, the relationship between the amount of money and the amount of drugs found, and the "characteristics" of a "drug distribution house." He also recounted, over the defense's objection, the questions asked by the unidentified Jamaican male who answered the call that Manzi made to the number that appeared on Headley's beeper screen. The trial court admitted these questions on the theory that they were those of a co-conspirator made in furtherance of the conspiracy. It also admitted, again over defense objection, Manzi's expert opinion that, based on his experience with Jamaican drug dealers during numerous narcotics investigations, the caller was seeking to purchase cocaine.

Next, Denise McCrary testified that, in exchange for money and drugs, she allowed Headley to use her apartment to distribute cocaine. She said that the week before their arrest, Headley arrived at her apartment with a large amount of cocaine, plastic bags, a triple-beam scale, a handgun and a pager. According to her, Headley had sold all the cocaine before the police raid on her apartment. She admitted, however, that the cocaine in her handbag, a hand-held scale, another bag of cocaine with a straw, and a sifter found in her apartment belonged to her. She testified that $28,000 in cash found in the cushions of her couch belonged to one of the other persons arrested at her apartment. She further stated that a phone message she took for Headley, which she wrote down on the back of an envelope, was from an individual she believed wanted to purchase cocaine.

In summation, the prosecutor recounted Manzi's testimony concerning Headley's arrest. Based on Manzi's expert testimony about "distribution houses," he argued that a conspiracy existed despite the absence of large amounts of drugs in McCrary's apartment. He also discussed Manzi's testimony about the unidentified caller's statements. He relied primarily on the extent and credibility of McCrary's testimony, but additionally argued that Manzi's testimony and the items seized provided further evidence that Headley was guilty of the crimes charged.

The jury convicted Headley on both narcotics counts. The trial court sentenced him to concurrent twelve-year prison terms for the narcotics convictions, which were to run consecutively to the five-year sentence imposed for his guilty plea for failure to appear at trial. After exhausting his appeals at the state level, Headley petitioned the district court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. The district court granted the petition, holding that Manzi's expert testimony and the statements made by the unidentified co-conspirator were erroneously admitted and had a substantial and injurious effect on the jury's verdict. The Warden now appeals.

## DISCUSSION

A state prisoner is entitled to habeas relief only if he is being held in custody in violation of a federal right. See 28 U.S.C. § 2254; Engle v. Issac, 456 U.S. 107, 119, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1982). A state trial court error does not rise to a federal constitutional violation sufficient for habeas relief, however, unless the petitioner can establish that the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, —— U.S. ——, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993); Samuels v. Mann, 13 F.3d 522, 526 (2d Cir.1993), cert. denied, —— U.S. ——, 115 S.Ct. 145, 130 L.Ed.2d 85 (1994). For the reasons stated below, we find that the trial court committed no error in admitting the expert testimony and the statements of the unidentified caller. Thus, we do not reach the "substantial and injurious effect or influence" test.

## I. *Expert Testimony*

█ The district court held that Manzi's expert testimony and the prosecution's reference to it in summation ran afoul of our decisions in *United States v. Castillo*, 924 F.2d 1227 (2d Cir.1991), and *United States v. Cruz*, 981 F.2d 659 (2d Cir.1992). In those cases, we held that the government may not strengthen the credibility of a fact witness by arguing that the witness's version of events mirrors an expert's description of patterns of criminal conduct, at least where the witness's account is not assailed as implausible. *See Castillo*, 924 F.2d at 1231, 1234–35; *Cruz*, 981 F.2d at 663.

In *Castillo*, the defendants were charged with numerous narcotics and firearm offenses after being arrested in a "buy and bust operation" in Washington Heights, New York. At trial, a rookie undercover officer testified that, upon buying cocaine from the defendants, one of the defendants displayed a gun and forced him to snort cocaine before letting the officer leave. *Castillo*, 924 F.2d at 1229. The difficulty with this testimony was that no gun was recovered. *Id.* at 1234–35. A veteran officer was then called as an expert on the typical operating methods of Washington Heights drug dealers. He introduced statistics about the use by drug dealers of guns to make potential customers sniff cocaine. *Id.* at 1231. He further explained that this particular practice was "'becoming more and more popular among the drug dealers in the Washington Heights area,' as a means of flushing out undercover officers." *Id.* In summation, the prosecution cross-matched the veteran officer's expert testimony with the rookie's fact testimony, arguing that one clearly validated the other. *Id.* at 1231, 1234. On appeal, we reversed the convictions, holding that the prosecution had improperly used the veteran's testimony about "typical" Washington Heights drug dealers to "propound the impermissible theory that appellants' guilt could be inferred from the behavior of unrelated persons." We further held that the misuse of the expert testimony and the heavy reliance on it in summation reinforced the rookie officer's fact testimony and "improperly tipped the balance against appellants." *Id.* at 1234–35.

Similarly, in *Cruz*, the defendant was charged with conspiracy to possess and distribute cocaine. Two fact witnesses, a drug dealer and a government informant, testified about their purported drug deals with the defendant in Washington Heights and Albany, New York. *See Cruz*, 981 F.2d at 659–60. Although these two witnesses asserted that the defendant was the "broker" in the deals, the defendant denied even being present during the alleged drug transactions. An FBI agent then testified as both a fact witness regarding the defendant's arrest and as an expert. He described typical drug trafficking operations in the Washington Heights area and the function of a broker in drug trafficking between Washington Heights and Albany. *Id.* In summation, the prosecution argued that the testimony of the drug dealer and the informant as to what had occurred was "precisely" like the operations described by the FBI agent. *Id.* at 661, 663. We reversed the conviction, holding that the government had extensively bolstered the credibility of the drug dealer and the informant by arguing that the agent's expert testimony "precisely" mirrored their version of events. *Id.* at 663.

*Cruz* and *Castillo* are inapposite for several reasons. First, in *Cruz*, we held that expert testimony regarding "typical" drug transactions is unnecessary when the defendant denies that he was present at the drug deal, rather than disputes his precise role in it. 981 F.2d at 663. Headley, however, concedes he was in McCrary's apartment (he was arrested there), but asserts that his presence at the McCrary "distribution house" was happenstance. Where the accused's defense is that he was on the scene but unaware of any drug transaction, we have held that expert testimony may be introduced to explain the defendant's role in the transaction. *See United States v. Brown*, 776 F.2d 397, 400–02 (2d Cir.1985), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986) (holding that there was no error in admitting expert testimony regarding a typical drug buy, including the role of a "steerer," where the accused's defense

was that he was on scene but unaware of any drug transaction). By explaining how to assess the size of a drug operation and the function of a "distribution house," Manzi showed that Headley's presence at McCrary's apartment was unlikely to be an unfortunate coincidence.

In addition, the expert's testimony in *Cruz* as to how typical· drug traffickers operate in Washington Heights and Albany was introduced to validate the other witnesses' testimony about the similar conduct of the defendant. We held that guilt may not be inferred from the patterned conduct of third parties. *See Cruz,* 981 F.2d at 663. Manzi's testimony concerning the operation of a typical "distribution house," however, was introduced, not to demonstrate a pattern of conduct, but to show that the physical evidence seized from the apartment was consistent with evidence that might be found at a distribution house. Headley's possession of items typically used in drug dealing as well as his presence in McCrary's apartment suggested his likely connection with the drug operation. Thus, unlike the expert testimony in *Cruz,* Manzi's testimony did not ask the jury to infer Headley's guilt from the conduct of unrelated individuals; rather the testimony pointed to Headley's direct association with the evidence.

Further, in *Castillo,* the expert testimony regarding the "typical" use of guns to force agents to snort cocaine served to reinforce the rookie officer's testimony that this is what happened to him—even though no gun had been recovered. Here, however, the police found a beeper and $890 in cash when they searched Headley. Manzi's testimony merely explained how those items are used in typical drug transactions. Although Manzi's testimony may have strengthened McCrary's story, it was not needed to demonstrate that Headley possessed the incriminating items.

Finally, and most importantly, the prosecutor in summation did not improperly bolster McCrary's testimony by "precisely" comparing it to a criminal template etched in Manzi's expert testimony. *See Cruz,* 981 F.2d at 663; *Castillo,* 924 F.2d at 1233–34. The prosecutor did not rely on Manzi's testimony to support McCrary's credibility. In-

stead, Manzi's testimony was used to argue that, even though large amounts of drugs were not found in McCrary's apartment, a conspiracy nonetheless existed because the purpose of the conspiracy—the sale of drugs for money—had already been accomplished. The prosecutor's discussion of Manzi's testimony in summation falls far short of the extensive bolstering in *Cruz* and *Castillo,* thus avoiding the principal evil identified in those cases. *See Cruz,* 981 F.2d at 663; *Castillo,* 924 F.2d at 1233–34. Accordingly, we find both *Cruz* and *Castillo* inapposite, and hold that the trial court properly admitted Manzi's expert testimony.

## II. *Statements of the Unidentified Caller*

The Warden also argues that the district court erred in holding that the trial court improperly admitted the unidentified Jamaican caller's statements as those of a co-conspirator. We need not reach this argument, however, because the statements were perfectly admissible as non-hearsay.

 We are free to affirm on any ground that finds support in the record, even if it was not the ground upon which the trial court relied. *Helvering v. Gowran,* 302 U.S. 238, 245, 58 S.Ct. 154, 157–58, 82 L.Ed. 224 (1937); *Leecan v. Lopes,* 893 F.2d 1434, 1439 (2d Cir.), *cert. denied,* 496 U.S. 929, 110 S.Ct. 2627, 110 L.Ed.2d 647 (1990). Here the trial court admitted the statements as those of a co-conspirator made during and in furtherance of the conspiracy. We need not enter that troublesome thicket, however, because we find that the caller's statements were admissible as non-hearsay under *United States v. Oguns,* 921 F.2d 442, 448–49 (2d Cir.1990).

In *Oguns,* a police officer answered a telephone call while searching the defendant's house pursuant to a valid warrant. The unidentified caller asked, "Have the apples arrived there?" *Id.* at 448. The district court allowed the officer to recount this question, and admitted additional evidence demonstrating that narcotics traffickers often use code words when discussing drugs on the telephone. *Id.* at 445, 449. We affirmed, reasoning that:

[t]he government legitimately used the phone call as circumstantial evidence of Oguns' knowledge and intent regarding the importation and distribution charges. The fact that an out-of-court statement is used to provide circumstantial evidence of a conspiracy does not require that the statement be analyzed under the co-conspirator exception to the hearsay rule.

*Id.* at 449 (citations omitted).

■ Here, as in *Oguns*, the questions asked by the unidentified Jamaican caller— "Are you up? Can I come by? Are you ready?"—were not admitted for their truth, but rather as circumstantial evidence that Headley used his beeper to receive requests for drugs. Evidence scholars are wont to characterize such statements as "mixed acts and assertions," *see generally* 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence 101–12 (2d ed. 1994), and admissibility is won by emphasizing the performance aspect of the statement. Thus, the question implies the speaker's belief that he is talking to a drug dealer; and that belief is regarded as circumstantial evidence of the nature of the business. By intellectual corner-cutting, the cases treat this as an assumption by the speaker that he has reached a drug den, rather than a direct assertion by him that "you are a drug dealer," an assertion that would surely trigger the hearsay rule, with its risks of insincerity, distorted perception, imperfect memory, and ambiguity of utterance. An assumption has a fair claim to be treated as non-hearsay since the attendant risks are not as intensively implicated as when the idea is directly enunciated in a statement. *See United States v. Long*, 905 F.2d 1572, 1579–80 (D.C.Cir.), *cert. denied*, 498 U.S. 948, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990).

Accordingly, the questions are non-hearsay, the exclusion of which is not mandated by any other evidentiary rule. In addition, although, as in *Oguns*, the caller's questions were seemingly innocuous, Manzi's expert opinion that the caller was seeking to purchase cocaine provided an alternative interpretation based upon his experience eavesdropping on numerous drug deals between Jamaican individuals. The jury was free to reject the government's interpretation in favor of the defense's construction that the caller was merely asking Headley to go out for the night.

■ Finally, we address briefly Headley's argument, raised during oral argument and superficially mentioned in his brief, that Manzi's testimony about "Jamaican" drug dealers and informants suggested that Headley was guilty only because he is a Jamaican. We disagree. This testimony was not a cynical injection of ethnicity of the type condemned in *Cruz*. *See Cruz*, 981 F.2d at 663–64.

In *Cruz*, the fact witnesses testified that they engaged in drug transactions with the defendant, to whom they referred as the "Dominican." The expert then testified that Washington Heights, an area "inundated with drug dealing," had a "very high Hispanic population" including "Dominican[s]." This testimony served no legitimate purpose, and we held that the prosecution had impermissibly injected the defendant's ethnicity as proof of criminal behavior. *Id.* at 663–64. Here, however, Manzi's testimony was introduced to explain the hidden meaning of the Jamaican caller's coded questions, not to suggest Headley's guilt by national origin. The testimony, therefore, had a necessary and legitimate purpose, making it admissible.

## CONCLUSION

The Connecticut trial court properly admitted both the expert testimony and the statements of the unidentified caller. Thus, Headley suffered no violation of a federal constitutional right, and is not entitled to federal habeas relief.

Reversed and Remanded with directions to deny the petition.