NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0568n.06

No. 12-6170

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jul 28, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| DARMUS J. DALTON, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE: SILER, GILMAN, and GIBBONS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Darmus Dalton was convicted of conspiracy to intentionally distribute and to possess with intent to distribute oxycodone in violation of 21 U.S.C. § 846. The district court sentenced him to 235 months' imprisonment. On appeal, Dalton challenges his conviction and sentence. Because Dalton was not deprived of his right to a fair trial due to the cumulative effect of alleged improper expert opinion testimony and alleged prosecutorial misconduct, and because his sentence was not procedurally unreasonable, we affirm.

I.

From December 2009, Darmus "Bubby" Dalton sold oxycodone and other pills in Somerset, Kentucky. He sold pills directly to addicts. He sold pills to other dealers. And other dealers sold pills on his behalf.

Dalton obtained oxycodone pills in two principal ways.  First, he purchased pills from other dealers.  Second, Dalton traveled to pain clinics in Florida and Georgia.  On these trips, Dalton traveled with other persons whose expenses he financed.  These persons obtained oxycodone prescriptions from pain clinics and filled the prescriptions at nearby pharmacies.  Dalton financed the trip expenses, doctor visits, and pharmacy charges.  In exchange, Dalton received approximately half of the pills obtained.  Sometimes, in exchange for the financing, Dalton charged more: fifty pills plus half of the remainder of the prescription.  Dalton would also pay persons to drive on these trips.

A federal grand jury indicted Dalton for conspiring with Craig West, Blake Gumm, William Padgett, Christi Combs, Joseph Stripling, and Andrea Ridner, between December 2009 and February 11, 2011, to intentionally distribute, and to possess with intent to distribute, oxycodone, in violation of 21 U.S.C. § 846.  The indictment also included a forfeiture count, seeking a $360,000 judgment representing the gross proceeds of the conspiracy.

After a three-day joint trial, a jury convicted Dalton, West, and Combs.  Following an evidentiary hearing on Dalton's objections to the presentence report (PSR) and the government's forfeiture claim, the district court sentenced Dalton to 235 months' imprisonment, a three-year term of supervised release, and ordered him to forfeit $200,000.  Dalton timely appealed.

## II.

On appeal, Dalton submits that the cumulative effect of improper expert opinion testimony and government misconduct during closing arguments violated his right to a fair trial.  "'The cumulative effect of errors that are harmless by themselves can be so prejudicial as to warrant a new trial.'"  *United States v. Adams*, 722 F.3d 788, 832 (6th Cir. 2013) (quoting *United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012)).  To obtain a new trial based upon

cumulative error, a defendant must show that the combined effect of individual harmless errors was so prejudicial as to render his or her trial fundamentally unfair. *Id.* Only the cumulative prejudicial effect of *errors* may undermine the fairness of a trial. *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004) ("'[A] cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.'" (quoting *United States v. Rivera,* 900 F.2d 1462, 1471 (10th Cir. 1990))). Thus, when determining a cumulative-effect claim, the court determines if the defendant's allegations of error have merit and, if so, considers whether the combined effect of the errors was so prejudicial as to warrant a new trial. *See, e.g.*, *id.*; *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004).

## A.

Dalton first argues that the district court erred by admitting the expert testimony of Detective Randy Hunter regarding the pattern Hunter observed in unrelated oxycodone-conspiracy investigations in Kentucky. A "trial court's determination whether [a] proffered expert opinion will assist the trier of fact to understand the evidence or to determine a fact in issue, is . . . review[ed] for abuse of discretion." *United States v. Jones*, 107 F.3d 1147, 1151 (6th Cir. 1997) (internal quotation marks and citation omitted). Under Federal Rule of Evidence 702, a person with "specialized knowledge" qualified by his or her "knowledge, skill, experience, training, or education" may give opinion testimony if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The proponent of an expert witness should pose qualifying and foundational questions before proceeding to elicit opinion testimony. *United States v. Johnson*, 488 F.3d 690, 698 (6th Cir. 2007). "Courts generally have permitted police officers to testify as experts regarding drug trafficking as long as the testimony is relevant and reliable." *Id.* (citing *United States v. Lopez-Medina*, 461 F.3d 724,

742–43 (6th Cir. 2006)). And we "'regularly allow[] qualified law enforcement personnel to testify on characteristics of criminal activity, as long as appropriate cautionary instructions are given, since knowledge of such activity is generally beyond the understanding of the average layman.'" *Id.* (quoting *United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004)); *see also United States v. Pearce*, 912 F.2d 159, 163 (6th Cir. 1990) ("Law enforcement officers may testify concerning the methods and techniques employed in an area of criminal activity and to establish 'modus operandi' of particular crimes. Knowledge of such activity is generally 'beyond the understanding of the average layman.'" (quoting *United States v. Espinosa*, 827 F.2d 604, 611 (9th Cir. 1987))).

In Dalton's trial, the government established that Detective Hunter had specialized knowledge regarding pill-trafficking conspiracies connecting eastern Kentucky and south Florida. After the government laid a foundation and began to elicit opinion testimony, Dalton objected that Hunter's opinion would not assist the jury in determining a fact in issue. The government then laid a broader foundation, inquiring into Detective Hunter's presentations at national law-enforcement conferences concerning pill-trafficking in eastern Kentucky. Detective Hunter then testified generally to operations of oxycodone conspiracies similar to the conspiracy alleged in this case. Hunter gave opinion testimony as to the source of oxycodone that he had seen in eastern Kentucky, the prevalence of particular kinds of pills, their respective street prices, the organizational structure of groups trafficking pills from south Florida to eastern Kentucky, the prevalence of cash-strapped pill abusers in these groups and the concomitant necessity of sponsors, the rate of return to the sponsor for financing the trips to Florida pain clinics, and the patterns of medical record-keeping at the pain clinics and pharmacies that supplied the prescriptions and pills. The district court denied Dalton's oral motion to exclude this testimony,

concluding that it was helpful because the details of oxycodone trafficking are usually beyond lay understanding. Further, the district court gave appropriate cautionary instructions regarding Hunter's testimony.

Relying on out-of-circuit case law, Dalton argues on appeal that expert testimony about patterns of drug-trafficking activity is not admissible for the purpose of bolstering the testimony of a cooperating witness. *See United States v. Cruz*, 981 F.2d 659, 663 (2d Cir. 1992). In *Cruz*, the Second Circuit held that the district court abused its discretion by allowing the expert testimony of a law enforcement special agent describing typical drug-trafficking operations in the Washington Heights neighborhood of New York and the function of a broker in drug trafficking between Washington Heights and the Albany area. *Id.* at 660. The *Cruz* court doubted that the agent's testimony was helpful to the jury. It concluded that the testimony was impermissible because the government's principal purpose was to bolster the testimony of a cooperating fact witness "where the [fact] witness's version [of events] is not attacked as improbable or ambiguous evidence of such conduct" and where the expert witness's "testimony logically adds nothing to the believability of the [fact] witness's account." *Id.* at 663. Leaning on *Cruz*, Dalton submits that the testimony of the fact witnesses as to the operation of the conspiracy was easily comprehensible and, hence, Detective Hunter's opinion testimony impermissibly served only to bolster the testimony of the fact witnesses.

Even if *Cruz* were precedent for this court, it would not control here. First, unlike in *Cruz*, Dalton attacked the credibility of the fact witnesses' version of events—indeed, his theory of the case was that they had lied. Moreover, Sixth Circuit precedent permits law-enforcement officers to "testify concerning the methods and techniques employed in an area of criminal activity and to establish 'modus operandi' of particular crimes." *Pearce*, 912 F.2d at 163

(finding, as here, that "[t]he trial court's decision to permit the expert testimony occurred after all other evidence had been introduced").  Detective Hunter's testimony was relevant for that purpose.  He testified about how pill-trafficking conspiracies are established, how they operate, and how sponsorships are prevalent.  It was not an abuse of discretion for the district court to conclude that the details of oxycodone trafficking—particularly the details concerning the necessity and development of sponsorship in pill-trafficking organizations—are not within the ambit of lay knowledge.  *See Johnson*, 488 F.3d at 698.  Thus, the district court did not err in concluding that Detective Hunter's opinion testimony reasonably assisted the jury "to understand the evidence." *See* Fed. R. Evid. 702.

Dalton also contends that Hunter's opinion testimony describing a previous investigation of a large-scale, pill-trafficking conspiracy ("Operation Flamingo Road") accomplished indirectly what is prohibited to the government in closing arguments—namely, an exhortation to jurors to convict a defendant in an attempt to respond to a drug problem in their community.  The government correctly points out that Dalton mischaracterizes Hunter's testimony.  Detective Hunter testified as to his participation in Operation Flamingo Road to establish his qualifications and to lay the foundation for his opinion testimony as to the operation of pill-trafficking conspiracies.  His testimony regarding his involvement in prior investigations of similar conspiracies does not amount to a call for an eastern Kentucky jury to respond to the drug problem touching their community.  Moreover, Hunter did not express an opinion on Dalton's guilt, did not testify as to Dalton's characteristics, did not remark on the credibility of the fact witnesses, and did not express an opinion on what the law requires—in short, Hunter did not intrude on the provinces of the jury or the court.  Accordingly, the district court did not err in admitting Detective Hunter's opinion testimony.

B.

Dalton also submits that the government made flagrantly improper remarks during its rebuttal closing argument. We employ a two-step inquiry to determine whether prosecutorial misconduct occurred. *United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008) (citing *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999)). First, we determine whether a statement was improper. If so, we then examine whether the statement was so flagrant as to warrant reversal. *Id.* We "consider[] four factors in determining whether a statement was flagrant: (1) whether the prosecutor's remarks or conduct tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were accidentally or deliberately made; and (4) the overall strength of the evidence against the accused." *Id.* (citing *Francis*, 170 F.3d at 549−50).

Dalton did not object at trial to the remarks he now challenges on appeal. Thus, his prosecutorial-misconduct claim is reviewed for plain error. *Henry*, 545 F.3d at 376. Plain-error review requires us "to determine whether '(1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings.'" *Id.* at 376−77 (quoting *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001)). "'Only in exceptional circumstances in which the error is so plain that the trial judge and prosecutor were derelict in countenancing it will this court reverse a conviction under the plain-error standard.'" *Id.* (quoting *Emuegbunam*, 268 F.3d at 406).[1]

---

[1] Because Dalton cannot establish that the district court erred in admitting Detective Hunter's testimony, the court does not need to determine how to cumulate unpreserved error (reviewed for plain error) with preserved error (reviewed for harmless error). The Sixth Circuit

In his first claim of prosecutorial misconduct, Dalton contends that counsel for the government, AUSA Stephen Smith, improperly placed his own personal integrity at issue during the government's rebuttal closing argument. Dalton points to the following remarks by the prosecutor:

> Likewise, the suggestion to you that if Detective Janutolo was just not so lazy and was just not so incompetent, and that prosecutor over there wasn't so coercive, then he'd played these audiotapes of these meetings with these witnesses, you'd find out the real truth. See, him and that detective, and according to Mr. Norfleet [Dalton's counsel], there's a conspiracy, and Steve Smith [the AUSA making this rebuttal argument] sits right in the middle of it, ladies and gentlemen, and he's got a motive to make up on Christi Combs and Mr. West and Mr. Dalton. He wants to get them all convicted wrongfully. They're innocent, but he's going to coerce, he's going to bribe and promise these witnesses something that he can't even do. Because the judge already told you, he's the one that's going to sentence these people. And if you believe Mr. Norfleet's version of these facts, you've got to believe that Mr. Smith and Detective Janutolo are part of a conspiracy to manufacture a case against these clients who are innocent and should walk freely out the doors of this courthouse.

In reply, the government contends that these remarks were made in response to Dalton's counsel's contentions made in closing argument that the government made "promises" and "coached" the witnesses. For example, Mr. Norfleet argued:

> Now, you know, you've heard me a lot, and honestly, I probably got on your nerves somewhat when I would ask all the detectives, Did you record these statements? You know why I wanted to have the statements? I'd like to play them for you, and I'll tell you. . . [why] I would like to play them for you. I would like to hear the promises that was made. I would like to hear how they was coached about who ultimately made the decision about the sentence, about what the judge has to consider to get there, and what this man can file to get a sentence reduction, and how the process works before this man files a sentence reduction. And it could have been done. . . . They're not recorded for a reason. They don't want the defense to have them, because it hurts them.

---

has not directly addressed this issue. *United States v. Warman*, 578 F.3d 320, 349 n.4 (6th Cir. 2009).

Even considering that AUSA Smith's remarks were made in reply to Dalton's comments, the injection of his personal integrity in rebuttal argument was arguably improper. In *United States v. Young*, the Supreme Court explained that "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." 470 U.S. 1, 18−19 (1985). Thus, it is improper for a prosecutor to assert his or her own credibility to bolster the credibility of a witness. It is also improper for the prosecutor to suggest that the prosecutor knows something that the jury does not know and thereby convey the impression that the jury should simply trust the government's judgment. *Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005). Accordingly, the Fifth Circuit has held improper an unequivocal statement by a prosecutor that, for the jurors to believe the defendant's account, they must believe in a government conspiracy. *See United States v. Gracia*, 522 F.3d 597, 601−02 (5th Cir. 2008). In this case, the prosecutor lampooned Dalton's attack on the credibility of the witnesses by suggesting that his theory of the case entailed that AUSA Smith himself was engaged in an illicit conspiracy to convict Dalton on false pretenses. By implying that this premise was ridiculous, the prosecutor indirectly suggested that he knew something the jurors did not (*i.e.*, that there was no such conspiracy) and implied that the jury should trust the government's judgment.

The dispositive inquiry, however, is not whether AUSA Smith's comments were improper, but whether the comments were so flagrant as to require reversal and so adverse that they seriously undermined the fairness of the judicial proceedings. Taken in context, AUSA Smith's comments were not reversibly flagrant. We "afford wide latitude to a prosecutor during closing argument, analyzing disputed comments in the context of the trial as a whole and recognizing that inappropriate comments alone do not justify reversal where the proceedings

were 'otherwise fair.'" *Henry*, 545 F.3d at 377 (quoting *Young*, 470 U.S. at 11); *see also United States v. Hitow*, 889 F.2d 1573, 1579 (6th Cir. 1989) ("Even if certain comments are found to be inappropriate, they . . . must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." (internal citation omitted)). "In order to make an appropriate assessment . . . [this] court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo. Thus the import of the evaluation has been that if the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." *Young*, 470 U.S. at 12−13.

We take into account defense counsel's remarks that precipitated the government's remarks. *Id.* at 12. In closing arguments, Dalton's counsel made speculative remarks about unrecorded conversations between the prosecution and the fact witnesses concerning alleged promises of the government's assistance in seeking sentencing reductions in exchange for inculpatory testimony. In response to these remarks, AUSA Smith's comments that Dalton's theory implies an incredible government conspiracy were, if not invited, then deliberately made to "right the scale." *See id.* at 13. As made in response to Mr. Norfleet's imputation of impropriety, we do not find that AUSA Smith's remarks misled the jury to convict on a basis other than the evidence presented.

Nor did AUSA Smith's comments constitute plain error. "Generally, an error does not affect substantial rights unless it is prejudicial—in other words, the error 'must have affected the outcome of the district court proceedings.'" *United States v. Bailey*, 488 F.3d 363, 368 (6th Cir. 2007) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). Dalton bears the burden of showing that the outcome of the trial would have been different but for AUSA Smith's allusion

to a straw-man government conspiracy. *See id.* ("The defendant bears the burden of persuasion that the error was prejudicial."). He fails in carrying that burden here. The testimony of Elridge, Robert Gumm, Blake Gumm, Hampton, Ard, Campbell, Fitzer, Stripling, and Burdine supports the conclusion that the jury verdict would not have been different. Hence, the prosecutor's remarks cannot be said to rise to the level of plain error. His statements, although arguably improper, "were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *Cf. Young*, 470 U.S. at 16.

Second, Dalton claims that AUSA Smith commented on Dalton's failure to testify, thereby violating his Fifth Amendment privilege against self-incrimination. *See Bowling v. Parker*, 344 F.3d 487, 514 (6th Cir. 2003) ("The law is clear that the prosecution cannot comment on a defendant's decision not to testify at trial." (citing *Griffin v. California*, 380 U.S. 609, 615 (1965))). Dalton highlights the following remark that the prosecution made during rebuttal closing argument:

> [A]nd see this trash that Mr. Norfleet wants to call trash. It's their trash, ladies and gentlemen. Those are their friends. These documents back there, these ledgers and diaries set forth that the trash that he's talking about are their friends. I didn't pick them. I didn't come in here and script these witnesses. They got problems. They've admitted they had problems. They violated the law. They admitted they violated the law. *Not everybody here's admitted that.* It's going to be your decision whether or not they have.

In response, the government contends that the statement—"not everybody here's admitted that"—referred to the credibility of Combs, which the prosecution addressed directly moments after making the challenged remark.

When a statement is challenged as an indirect comment on the defendant's decision not to testify, we use four factors to evaluate such a statement: "'1) Were the comments manifestly intended to reflect on the accused's silence *or* of such a character that the jury would naturally

and necessarily take them as such; 2) were the remarks isolated or extensive; 3) was the evidence of guilt otherwise overwhelming; 4) what curative instructions were given and when.'" *Bowling*, 344 F.3d at 514 (quoting *Lent v. Wells*, 861 F.2d 972, 975 (6th Cir. 1988)). Applying this framework, the prosecution's statement does not rise to constitutional error. It is not manifest that the comment was intended to reflect on Dalton's decision not to testify. Nor is the character of the passing remark so pronounced that the jury naturally and necessarily would have understood the remark as a comment on Dalton's silence. Further, the challenged statement was isolated, and the evidence of Dalton's guilt was strong, supported by the testimony of no less than eight fact witnesses. The prosecutor therefore did not violate Dalton's privilege against self-incrimination as alleged by Dalton.

### C.

In sum, Dalton's cumulative-error claim fails; there are no errors to cumulate. Dalton cannot establish that the district court erred by admitting Detective Hunter's opinion testimony. Nor can Dalton show that the prosecutor's remarks during rebuttal closing argument were plain error.

### III.

Dalton additionally challenges the procedural reasonableness of his 235-month sentence on appeal. The presentence report (PSR) found that Dalton was responsible for 84,900 milligrams of oxycodone—the equivalent of 568.83 kilograms of marijuana—and determined that, pursuant to USSG § 2D1.1(c)(6), Dalton's offense had a base level of 28. The PSR then found that Dalton was an organizer or leader of a criminal activity that involved five or more participants and was otherwise extensive. Accordingly, the PSR added four levels pursuant to USSG § 3B1.1(a) for a total offense level of 32. The PSR calculated that Dalton's criminal

history score was six, establishing a criminal history category of III. Both the government and Dalton objected to the drug quantity determined by the PSR, and Dalton objected to the four-level increase for being an organizer and leader in the conspiracy. Dalton also objected to his guilt, the assessment of two criminal history points for committing the instant offense while under a sentence for third-degree rape, and the suggestion that there was an aggravating factor to justify an above-guidelines sentence.

At the sentencing proceeding, the district court found that the government established by a preponderance of the evidence that Dalton was responsible for 200,000 milligrams of oxycodone. The district court primarily based this finding on Hampton's trial testimony and emphasized that the 200,000-miligram quantity was conservative. Accordingly, the district court sustained the government's objection and overruled Dalton's drug-quantity objection to the PSR.

Turning to the four-level enhancement, the district court overruled Dalton's objection, concluding that Dalton was an organizer or leader "based on the evidence presented at trial," and applied the four-level increase pursuant to USSG § 3B1.1(a). The district court then denied Dalton's criminal-history-points objection as moot, and adopted the PSR "with the previous modifications." The district court determined that Dalton's offense merited a total offense level of 36 and a criminal history category of III, and accordingly was subject to a guidelines range of 235 to 293 months. The district court then heard allocution as to the appropriate sentence, considered the sentencing factors under 18 U.S.C. § 3553(a), and imposed a bottom-of-the-range sentence of 235 months.

On appeal, Dalton claims the sentence was procedurally unreasonable because the district court improperly calculated the guidelines range and based the sentence on clearly erroneous facts. Specifically, Dalton lodges two procedural-reasonableness challenges: First, he claims

that the district court's drug-quantify finding was erroneous.  Second, he disputes the four-level, aggravating-role enhancement applied pursuant to USSG § 3B1.1.

A.

We review criminal sentences for both substantive and procedural reasonableness.  *Gall v. United States*, 552 U.S. 38, 51 (2007).  "Reasonableness is determined under the deferential abuse-of-discretion standard."  *United States v. Battaglia*, 624 F.3d 348, 350 (6th Cir. 2010).  In determining procedural reasonableness, one factor this court assesses is "whether the district court properly calculated the Guidelines range."  *Id.* at 350–51.  If the district court misinterprets the guidelines or miscalculates the guidelines range, then the resulting sentence is procedurally unreasonable.  *United States v. Bolds*, 511 F.3d 568, 579 (6th Cir. 2007).  "The court's legal interpretation[s] of the Guidelines are reviewed de novo, but its factual findings are reviewed under the clearly-erroneous standard."  *Battaglia*, 624 F.3d at 351.  "And the government bears the burden to 'prove, by a preponderance of the evidence, that a particular sentencing enhancement applies.'"  *United States v. Stubblefield*, 682 F.3d 502, 510 (6th Cir. 2012) (quoting *United States v. Dupree*, 323 F.3d 480, 491 (6th Cir. 2003)).

We review a district court's drug-quantity determination as a factual finding under the clearly erroneous standard.  *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008) (citing *United States v. Sandridge*, 385 F.3d 1032, 1037 (6th Cir. 2004)).  If the exact amount of drugs is undetermined, "an estimate will suffice, but . . . a preponderance of the evidence must support the estimate."  *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990); *see also United States v. Hernandez*, 227 F.3d 686, 699 (6th Cir. 2000) ("Approximations are completely appropriate.").  A district court may not "hold a defendant responsible for a specific quantity of drugs unless the court can conclude the defendant is more likely than not *actually* responsible for

a quantity greater than or equal to the quantity for which the defendant is being held responsible." *Walton*, 908 F.2d at 1302; *see also Sandridge*, 385 F.3d at 1037 (holding that "the court may make an estimate supported by competent evidence, but that the evidence supporting the estimate must have a minimal level of reliability beyond mere allegation, and the court should err on the side of caution in making its estimate" (internal quotation marks omitted).

Further, the district court's estimate may be based upon physical evidence (such as seized drugs) or testimonial evidence. *United States v. Pruitt*, 156 F.3d 638, 647 (6th Cir. 1998). "[T]estimonial evidence from a coconspirator may be sufficient to determine the amount of drugs for which another coconspirator should be held accountable." *United States v. Swanberg*, 370 F.3d 622, 625 (6th Cir. 2004) (quoting *Hernadez*, 227 F.3d at 697). This court "afford[s] the district court's credibility determinations regarding witness testimony great deference." *United States v. Esteppe*, 483 F.3d 447, 452 (6th Cir. 2007). "Clear error will not be found where two permissible views of the evidence exist." *Jeross*, 521 F.3d at 570 (citing *Anderson v. City of Bessemer*, 470 U.S. 564, 573−74 (1985)). And "a district court's approximation of drug quantity is not clearly erroneous if it is supported by competent evidence in the record." *Id.* (citing *United States v. Brannon*, 7 F.3d 516, 520 (6th Cir. 1993)).

Here, a preponderance of evidence supports the district court's conservative estimation that Dalton was responsible for 200,000 milligrams of oxycodone. At the sentencing hearing, the district court heard the testimony of Detective Anthony Janutolo. Janutolo subpoenaed the available records of medical providers under investigation and created a summary thereof. Janutolo testified that those records demonstrate that, over a five-month period, Dalton was on average responsible for 16,500 milligrams per month. The district court then credited Hampton's testimony that he and Dalton travelled together to Florida fifteen to twenty times to

obtain oxycodone. Extrapolating from the average milligrams acquired per month and a conservative estimate of the number of trips that Hampton and Dalton took to obtain oxycodone, the district court estimated that Dalton was responsible for 202,500 milligrams.[2]

Moreover, the record contains ample evidence of quantities of oxycodone for which Dalton was responsible apart from the district court's extrapolation based on the medical records and Hampton's testimony. For example, based on trial testimony, Detective Janutolo estimated that Robert Gumm sold between "102,000 to 136,000 milligrams" of oxycodone on behalf of Dalton over the period from November 2009 to April 2010. Detective Janutolo also estimated Blake Gumm purchased between "19,840 to 23,680" milligrams from Dalton. In addition, Eldridge bought 80-milligram tablets from Dalton "on a regular basis" from February 2010. Hampton saw Dalton purchase 300 pills from West. And Campbell traded his motorcycle to Dalton for twenty 80-milligram pills. The district court considered all of this record evidence, made an estimation "out of an abundance of caution," and found Dalton responsible for 200,000 milligrams.

Dalton now argues that the district court improperly extrapolated its estimation of the quantity of oxycodone for which he was responsible. He specifically contends that the district court's reliance on Hampton's testimony as to the number of trips Dalton took to Florida (fifteen) was erroneous. First, Dalton submits that Hampton's testimony was not credible because Hampton admitted he was using oxycodone on a daily basis and during his direct and

---

[2] Excluding those co-conspirators whom Dalton sponsored, Detective Janutolo's summary indicates that Dalton himself received oxycodone four times: On April 23, 2010, he obtained 180 oxycodone 30-milligram pills; on May 21, 2010, he obtained 210 oxycodone 30-milligram pills; on June 21, 2010, he obtained 240 oxycodone 30-milligram pills; and on July 21, 2010, he obtained 240 oxycodone 30-milligram pills.

cross examinations at trial he could not answer various questions because his memory was impaired by drug use. But the district court found Hampton's testimony "corroborated," "never impeached," and "extremely credible." This determination is afforded great deference. *See Esteppe*, 483 F.3d at 452. Moreover, testimonial evidence from Hampton, one coconspirator, can be sufficient to determine the quantity of drugs for which Dalton, another coconspirator, is responsible. *See Swanberg*, 370 F.3d at 625.

Dalton also contends that Hampton's testimony does not establish that Dalton made at least fifteen trips to Florida to obtain oxycodone. Dalton argues that when Hampton estimated making fifteen to twenty trips, Hampton gave his answer in response to a leading question and that other portions of his testimony make clear that the estimation actually referred to the total number of trips he had made either on his own or with others. The record, however, does not support Dalton's interpretation. During direct examination, Hampton responded to AUSA Smith's straightforward question about the number of visits Hampton and Dalton made together: "Q. And how many trips do you think you made to Florida with Mr. Dalton for the purpose of getting these oxycodone pills? A. I don't know the exact amount, anywhere from fifteen to twenty probably." Dalton attempts to equivocate Hampton's estimation of the number of trips that Dalton took to Florida to obtain oxycodone with Hampton's testimony to the percentage of times that Dalton sponsored Hampton on their joint trips. But those are different inquiries, and Hampton's testimony regarding the latter does not call into question the district court's reliance on his testimony that Dalton made at least fifteen trips to Florida.

The district court's conservative estimate that Dalton was responsible for 200,000 milligrams of oxycodone was supported by competent evidence in the record. Therefore, it is not clearly erroneous.

B.

Next, Dalton challenges the four-level, aggravating-role enhancement applied due to his role as an organizer or leader of a criminal activity. *See* USSG § 3B1.1(a). We review a sentencing court's factual findings regarding a defendant's role in a conspiracy for clear error. *Hernandez*, 227 F.3d at 699. Whether these facts warrant a sentence enhancement pursuant to § 3B1.1(a) is a legal conclusion subject to *de novo* review. *Id.* (citing *United States v. Gort-DiDonato*, 109 F.3d 318, 320 (6th Cir. 1997)). "To apply the § 3B1.1 enhancement, the government must establish, by a preponderance of the evidence, the elements of § 3B1.1." *Gort-Didonato*, 109 F.3d at 320 (citing *United States v. Ledezma*, 26 F.3d 636, 644 (6th Cir. 1994)).

USSG § 3B1.1(a) calls for a four-level increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." USSG § 3B1.1(a). USSG § 3B1.1 commentary application note 2 provides that to qualify for the enhancement, a defendant must have been the organizer or leader of one or more participants in the criminal activity. USSG § 3B1.1, comment. (n.2); *see also United States v. Baker*, 559 F.3d 443, 449 (6th Cir. 2009) (enhancement requires only that defendant supervised or managed "*one of the five or more other participants*" (quoting *United States v. Robinson*, 503 F.3d 522, 529 (6th Cir. 2007))). Application note 4 provides that "[f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." USSG § 3B1.1, comment. (n.4). Application note 4 also makes clear that there can "be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." *Id.*

The district court correctly applied the § 3B1.1(a) sentencing enhancement. First, the conspiracy involved five or more participants. Four codefendants pled guilty. Two codefendants were found guilty by the jury.

Second, the record supports the district court's conclusion that Dalton was an organizer or leader of the conspiracy. Dalton played the part of an organizer because he financed the travel expenses of co-conspirators to Florida for the purpose of obtaining oxycodone. He covered trip expenses, doctor visits, and pharmacy charges of several co-conspirators. He organized and paid a co-conspirator to drive him to Florida for the purpose of obtaining oxycodone. Dalton also claimed the right to a larger share of the fruits of the conspiracy, collecting fifty percent or more of the pills obtained by the co-conspirators whom he sponsored. Dalton sold some of the pills he obtained to other dealers, and other dealers sold pills on his behalf.

Dalton submits that the four-level enhancement does not apply because *United States v. Ward* held "that 'the mere fronting' of [drugs] alone is insufficient to support finding a management relationship.'" 37 F.3d 243, 248 (6th Cir. 1994) (quoting *United States v. Possick*, 849 F.2d 332, 336 (8th Cir. 1988)). The *Ward* court noted that "fronting" drugs is merely a variant of a traditional buyer-seller relationship and, by itself, does not establish a drug-supplier's leadership or organizational role. *Id.* Dalton suggests that there is no difference between the "fronting" of drugs and his activity in this case. *Ward*, however, does not guide our decision. First, *Ward* noted that "[t]he government provided no evidence that Ward set prices or arranged drug transactions." *Id.* Here, Dalton arranged numerous expeditions to Florida to obtain oxycodone, which he later sold or had sold on his behalf in Kentucky. Second, Dalton did more than merely "front" drugs. *See id.* Dalton organized the Florida oxycodone expeditions, financed the up-front costs, and, in at least one case, paid for a co-conspirator to work as a driver.

Dalton's financing supports the four-level enhancement. *See United States v. Bates*, 78 F.3d 585, 1996 WL 84631, at *4 (6th Cir. 1996) (unpublished table disposition) (affirming defendant's four-level enhancement under § 3B1.1(a) where defendant financed an out-of-state trip to obtain illegal drugs and provided expense money). Moreover, but for his sponsorship and leadership some of the drug transactions forming part of the conspiracy would not have occurred.[3] Therefore, the district court did not err in applying the four-level enhancement.

Because the district court's conservative estimate that Dalton was responsible for 200,000 milligrams of oxycodone was supported by competent evidence in the record and because the district court did not err in applying the aggravating-role sentencing enhancement, Dalton cannot show that the 235-month sentence was procedurally unreasonable.

IV.

For the foregoing reasons, we affirm Dalton's conviction and sentence.

---

[3] Burdine's testimony is particularly illuminating: "To begin with, there was no agreement between us because originally the deal was that I would drive; that was my primary goal or responsibility, was to drive. And once we were about half-way there, Mr. Dalton, through conversation with me, realized that I had a current MRI, and asked if I wanted to have him pay for me to be seen, and if so, you know, then I got my prescriptions, we would make arrangements after that. But I'm not sure if the arrangements were made prior or after, but I do know that he suggested or said that he takes 50 off the top and then half of what's left."