NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0468n.06

No. 19-3631

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 07, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| MICHAEL MEADOWS, | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:    ROGERS, KETHLEDGE, and NALBANDIAN, Circuit Judges.

ROGERS, Circuit Judge.  A jury found Michael Meadows guilty of drug distribution and firearm offenses.  Meadows argues that his conviction was tainted by a variety of trial errors, including the introduction of opinion testimony about typical drug trafficking behavior and statements by the prosecutor regarding the harmful effects of opioids.  The errors Meadows alleges, however, were not sufficiently serious to warrant reversal under the applicable plain error standard of review.  Meadows' remaining contentions on appeal are also without merit.

In January 2018, Larry Henderhan, a special agent for the Food and Drug Administration's criminal enforcement division, obtained a warrant to search Michael Meadows' home on suspicion that Meadows was trafficking heroin and fentanyl.  Before executing the warrant, Henderhan located Meadows where he worked at Buckeye Waste Industries in Akron.  Henderhan informed Meadows that there was a warrant to search his home and requested Meadows' cooperation in a drug investigation.  Henderhan also told Meadows that under no circumstances would he be

arrested that day. Meadows agreed to speak with Henderhan and another agent and provided the agents with a key to his home. After being patted down for weapons, Meadows sat in the passenger seat of Henderhan's truck. The agents instructed Meadows that he was free to leave at any time and was not obligated to speak with the agents. Meadows revealed that he had heroin stored in a hot sauce box near his bed and a loaded .45 caliber handgun located in his underwear drawer. Meadows also volunteered that his "biggest customer" was a white male by the name of Jim. Meadows declined, however, to identify his heroin supplier. At this point Henderhan concluded the interview and Meadows returned to work.

A search of Meadows' home revealed a loaded firearm and a hot sauce box in the locations Meadows had described. Inside the box were two bags, each containing approximately 50 grams of a mixture of heroin, fentanyl, and carfentanyl. The box also contained $8,600 in cash, a digital scale, and a razor blade. Agents discovered a shoebox in the bedroom closet containing a second digital scale as well as sleeping pills and other similar substances that are commonly used to dilute or "cut" narcotics.

Meadows was charged with being a felon in possession of a firearm,[1] possession with intent to distribute fentanyl, and possession of a firearm in furtherance of a drug trafficking offense. At trial, the Government called four witnesses. The first witness was special agent Henderhan, who recounted his interaction with defendant and the discovery of drug trafficking evidence in defendant's home. Based upon his decades of experience in law enforcement, including as a special agent investigating drug crimes, Henderhan also provided opinion testimony about the drug trade and discussed the steps normally taken when executing narcotics search warrants. The Government's second witness was Brian Callahan, a 17-year veteran of the Akron police

---

[1] Meadows stipulated to being a convicted felon and thus did not contest this charge at trial.

department's narcotics bureau. Callahan was not involved in Meadows' case and therefore provided only opinion testimony concerning the methods and techniques commonly employed by drug dealers, as well as the typical methods of investigating drug trafficking schemes. The Government's third witness was a forensic investigator who testified that the firearm in question had travelled through interstate commerce. The final witness was the lab technician who determined the composition and quantity of the drugs recovered from defendant's home. Meadows did not call any witnesses. The jury returned a guilty verdict, and the district court sentenced Meadows to 131 months' imprisonment. This appeal followed.

Meadows argues first that Henderhan and Callahan provided improper testimony regarding the "profile" of a drug dealer and that this testimony was likely perceived by the jury as substantive evidence of defendant's guilt. Defendant did not object to the assertedly improper testimony at trial and thus he must show that admission of that testimony was plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Ford*, 761 F.3d 641, 655 (6th Cir. 2014). That standard requires that (1) there was legal error (2) that was clear and (3) that affected defendant's substantial rights and (4) that seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Lawrence*, 735 F.3d 385, 401 (6th Cir. 2013). "Meeting all four prongs is difficult, 'as it should be.'" *Id.* (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

Meadows contests the testimony from Henderhan and Callahan regarding the general frequency with which drug dealers carry firearms; how drug traffickers tend to deal in cash; some of the common tools of drug dealing, including cutting agents and digital scales; and whether heroin and fentanyl are typically trafficked together. The agents also provided related testimony concerning the typical street value of heroin and fentanyl as well as the customary amount of heroin consumed by users daily.

Contrary to Meadows' contention, the trial court did not plainly err in admitting the challenged testimony. Henderhan and Callahan each had extensive experience in law enforcement and drug interdiction in particular, and their testimony was helpful to the jury in understanding the drug trafficking evidence presented. The expert testimony was furthermore relevant to show that Meadows intended to sell, rather than merely use, the drugs found, and that the firearm recovered was linked to Meadows' drug dealing.

The law permits use of law enforcement experts to establish the modus operandi of drug trafficking crimes. *See United States v. Pearce*, 912 F.2d 159, 163 (6th Cir. 1990). Expert testimony of this type is admissible under Federal Rule of Evidence 702 because it assists the jury in understanding the drug trade, an area which is "not within the experience of the average juror." *United States v. Thomas*, 74 F.3d 676, 682-83 (6th Cir. 1996), *abrogated on other grounds by Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997); *accord United States v. Ham*, 628 F.3d 801, 804-05 (6th Cir. 2011). As we have explained, "the average juror is unlikely to understand the significance of drug paraphernalia, quantities, and prices or appreciate the difference between 'street level' drug dealers and other types of distribution operations." *Thomas*, 74 F.3d at 682. Accordingly, as we have held, expert testimony may be admitted to explain the close connection between firearms and drug trafficking, *United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004), the items commonly possessed by drug dealers, *Thomas*, 74 F.3d at 683, and the quantity of drugs consistent with distribution rather than personal use, *Ham*, 628 F.3d at 805.

Furthermore, the contested testimony was properly admitted notwithstanding defendant's characterization of it as "drug profile testimony." Although testimony about whether a defendant fits a particular social or personal profile may not be admitted as substantive evidence of the defendant's guilt, that is different from testimony demonstrating how certain crimes are

committed. *See United States v. Baldwin*, 418 F.3d 575, 581 (6th Cir. 2005). Indeed, we have in an unpublished decision rejected a similar drug-dealer-profile-testimony argument. *See United States v. Goode*, 182 F.3d 919, 1999 WL 520553, at *3 (6th Cir. 1999) (unpublished table decision).

Other circuits, moreover, have also reasoned that the "profile testimony" label does little to undermine the admissibility of testimony about the tools and methods of drug dealers when, as here, it helps the jury to understand the evidence presented. *See United States v. Becker*, 230 F.3d 1224, 1231 (10th Cir. 2000); *United States v. McDonald*, 933 F.2d 1519, 1521-23 (10th Cir. 1991); *United States v. White*, 890 F.2d 1012, 1013-14 (8th Cir. 1989). In *McDonald*, for instance, the Tenth Circuit held that the district court did not abuse its discretion in allowing opinion testimony describing the methods and characteristics of those who deal crack cocaine. 933 F.2d at 1521-23. In doing so, the Tenth Circuit eschewed the distinction between profile and non-profile testimony in favor of Rule 702's "common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject." *Id.* at 1522. The court reasoned that evidence presented about the quantity of cocaine recovered as well as defendant's possession of "tools of the trade," including a razor blade, loaded firearm, and large amount of cash, would not be understandable without the benefit of specialized knowledge. *Id.*

Even assuming that the trial court erred in admitting Henderhan's and Callahan's testimony, Meadows has not demonstrated that the error affected his substantial rights. The phrase "affects substantial rights" "in most cases means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *United States v. Ataya*, 884 F.3d 318, 323 (6th Cir. 2018) (internal ellipsis omitted) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)).

Meadows cannot show prejudice given the strong evidence of his guilt. Testimony at trial indicated that the heroin recovered from Meadows' home had a street value of between $7,000 and $15,000 and was enough to supply even the most tolerant heroin user for over a month. "Intent to distribute can be inferred from the possession of a large quantity of drugs, too large for personal use alone." *United States v. Jackson*, 55 F.3d 1219, 1226 (6th Cir. 1995). The recovery of a loaded firearm, large amount of currency, cutting agents, and multiple digital scales was furthermore consistent with distribution of controlled substances. *See United States v. Montgomery*, 491 F. App'x 683, 689 (6th Cir. 2012). In addition, Meadows effectively admitted selling heroin when, soon after disclosing to Henderhan the heroin in his bedroom, he stated that his "biggest customer" was a white male named Jim. Finally, the jury could have easily concluded that Meadows possessed a firearm in furtherance of drug trafficking. The loaded firearm in Meadows' underwear drawer was located only three to four feet away from where Meadows stored heroin, currency, and drug paraphernalia. A loaded firearm discovered nearby a defendant's drug supply is a strong indication that the gun was used to protect drugs or drug proceeds. *See United States v. Ray*, 803 F.3d 244, 264-65 (6th Cir. 2015). The inference that the firearm was possessed in furtherance of drug trafficking is further strengthened when, as here, the firearm was possessed illegally by virtue of defendant's status as a convicted felon. *See id.* at 264. In light of this compelling evidence, it cannot be said that omission of the challenged testimony would have affected the outcome of Meadows' trial.

In arguing otherwise, Meadows highlights facts he claims indicate he was not engaged in drug dealing. Meadows maintains that he had a house, a stable family, and a steady job, things which he says drug dealers often lack. Also, Meadows was not found to have possessed drug packaging materials, multiple cell phones, or drug ledgers—each of which is commonly associated

with drug dealing.  Further, Meadows suggests that digital scales can be useful to those who both use and sell drugs, and that a loaded firearm can serve purposes aside from protecting drug supplies.  But to be sufficient for a conviction, "the evidence need not remove every reasonable hypothesis except that of guilt."  *United States v. Clark*, 634 F.3d 874, 876 (6th Cir. 2011).  That the evidence, or lack thereof, permitted multiple plausible inferences—some of which were favorable to Meadows—does not negate the far more likely conclusion that Meadows was engaged in drug distribution and that he possessed a firearm in furtherance of drug trafficking.

It is true that Meadows has identified some arguably irrelevant aspects of the testimony given at his trial.  For example, the Government's witnesses repeatedly described the dangers faced by officers executing narcotics search warrants, including the precautions those officers must take to avoid gunshot wounds and accidental fentanyl poisoning.  This questionably relevant testimony likely cast defendant in a negative light.  Also questionable was special agent Henderhan's occasionally interspersing expert testimony with fact testimony, especially absent a cautionary instruction.[2]  Although a law enforcement officer may function as both an expert and fact witness, the better practice in these circumstances is for the government and district court to clearly distinguish the dual roles of the witness in order to avoid juror confusion.  *See United States v. Rios*, 830 F.3d 403, 414 (6th Cir. 2016); *Thomas*, 74 F.3d at 683.  In addition, expert testimony about drug trafficking is ordinarily presented after the introduction of all the evidence.  *See Pearce*, 912 F.2d at 163; *see also United States v. Dalton*, 574 F. App'x 639, 643 (6th Cir. 2014).  But our review of this claim is for plain error.  Such close evidentiary calls lie at the heart of the reason for limited plain error review, where there has been no objection.  Defendant did not object, and if he

---

[2] The district court did not provide a cautionary instruction with respect to Henderhan, but provided one with respect to the other three witnesses.  That instruction stated, "You do not have to accept Detective Callahan, ATF Special Agent John Laurito nor chemist McCauley's opinions. In deciding how much weight to give it, you should consider the witness's qualifications and how he or she reached his or her conclusions."

had, the district court could easily have excluded that testimony or given a curative instruction. Without trial counsel's having done so, the defendant has the burden on appeal of demonstrating that any wrongful admission of testimony seriously affected the fairness, integrity or public reputation of the judicial proceeding. *See* Fed. R. Crim. P. 52(b); *Ataya*, 884 F.3d at 322-23. Meadows has not met that burden.

Meadows next argues that his conviction should be overturned because prosecutorial misconduct deprived him of a fair trial. As with his earlier claim, our review is limited to plain error because Meadows did not make a contemporaneous objection at trial.

Meadows' prosecutorial misconduct claim has three main components. First, Meadows asserts that the prosecutor during closing argument made disparaging remarks about Meadows' invocation of his Fifth Amendment right against self-incrimination. Second, counsel for the Government purportedly made inflammatory comments in closing argument concerning the dangers of opioids and the frequency with which drug dealers carry guns. Third, according to Meadows, the Government improperly bolstered its witnesses. On plain error review, these arguments lack merit.

First, the prosecutor's reliance in closing argument on Meadows' refusal to identify his supplier, without objection, was not so clearly prejudicial as to amount to plain error. Meadows claims that he invoked his Fifth Amendment right against self-incrimination during his interview with special agent Henderhan by stating, "I can't tell you that" in response to Henderhan's request that Meadows divulge his drug supplier. According to Meadows, the Government used his silence as substantive evidence of guilt when the prosecutor stated the following during closing argument:

> What's more, [Meadows] talked about [how] he was asked whether or not he had a supplier, somebody he might identify that provides him with that substance. He indicated that yes, he did have one, but he didn't want to offer that information.

He didn't say, "No, I don't have a supplier." Again, an acknowledgement that [drug dealing] is the practice and the business that he's engaged in.

Meadows relies upon *Combs v. Coyle*, 205 F.3d 269, 283 (6th Cir. 2000), in which we held that "the use of a defendant's prearrest silence as substantive evidence of guilt violates the Fifth Amendment's privilege against self-incrimination." In *Combs*, we also observed in dictum that the privilege against self-incrimination may be invoked in a case such as this one, where defendant was not yet in custody. *See id.* at 284. The Government responds that under the reasoning in *Salinas v. Texas*, 570 U.S. 178, 183 (2013) (plurality opinion), a defendant's pre-arrest silence is fair game at trial when the defendant has not unambiguously invoked the privilege. The statement "I can't tell you that," the Government argues, is precisely the type of ambiguous statement the Supreme Court has said would be insufficient to invoke the privilege. *See Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010).

We need not decide whether the Government violated Meadows' right against self-incrimination because, under the applicable plain error standard of review, Meadows' claim fails clearly for lack of prejudice. Any inference the jury might have drawn from defendant's refusal to answer Henderhan's drug supplier question would have had minimal effect given the extensive properly admitted evidence establishing that defendant had engaged in drug distribution. Moreover, any prejudicial impact from the use of defendant's silence was limited by the fact that the Government raised the issue only in opening and closing arguments and not during the evidentiary portion of the trial.[3] The district court instructed the jury multiple times that the attorneys' statements and arguments are not evidence. Such an instruction lessens the risk of unfairness resulting from prosecutorial misconduct during closing argument. *See United States v.*

---

[3] Henderhan mentioned defendant's refusal to disclose his drug supplier when he was asked during direct examination to recount his interview with defendant. However, Government's counsel did not ask any follow up questions relating to the drug supplier testimony.

*Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001); *Cherry v. Jago*, 722 F.2d 1296, 1300 (6th Cir. 1983).

Defendant's second argument, that the prosecution made inflammatory "community protection" statements at trial, likewise lacks merit. Some of the challenged statements are facially relevant. Defendant asserts for instance that the statements and testimony at trial about the close connection between firearms and drug dealing improperly emphasized the danger to the community from the crime defendant allegedly committed. However, the Government had the burden of proving defendant's firearm was connected to his drug dealing activities. Also, as mentioned, the government is permitted to use expert testimony regarding the connection between guns and drug dealing to help demonstrate that a particular defendant's possession of a firearm was in furtherance of drug trafficking. *See Swafford*, 385 F.3d at 1030; *Pearce*, 912 F.2d at 163. The prosecuting attorney was therefore justified in referring to expert testimony of this kind to argue that Meadows had a gun in order to protect his drug supply. Indeed, we recently held that a prosecutor's comments about guns and drugs "go[ing] together" did not constitute prosecutorial misconduct. *See United States v. Cleveland*, 907 F.3d 423, 439 (6th Cir. 2018) (alteration in original).

Defendant also argues that the prosecuting attorney acted improperly when he repeatedly alluded to the harm that results from dealing illegal narcotics such as fentanyl. Many of these comments came during the rebuttal portion of closing argument, in which the prosecutor attempted to explain to the jury that Meadows need not have known that the heroin he distributed contained fentanyl in order to be convicted of the crime of fentanyl distribution. Were it not this way, the prosecutor argued, "we wouldn't be able to charge anybody with selling this poison on the streets." The prosecutor also referred to earlier testimony about how drug dealers often do not know

whether the heroin they sell contains fentanyl. The prosecutor told the jury that, in practice, the only way to know the strength of the heroin sold on the street is to "test it out on the citizens of the Northern District of Ohio." This essentially amounted to an explanation of the purpose of the law. In addition, the prosecutor made a series of remarks about the dangers of consuming fentanyl:

> I would submit to you, though, it's not a situation of [prosecutorial] overreaching. Instead, it's a responsible reaction to a person who is out there selling a substance so dangerous and so deadly that every single person who knows what it is involved in the investigation, from the law enforcement officers to the person who inspected it at the laboratory, had to take extra caution, extra safety measures to keep themselves from touching it, keep their hands protected, their mouths protected in case it went airborne, because just touching you could result in such a dangerous and possibly deadly reaction, they're doing everything they can to protect themselves but still investigate this case.

These remarks emphasized the potentially deadly effects of fentanyl and arguably took the jury's focus away from the relevant question of defendant's guilt.

In this case, the prosecutor's comments about the dangers posed by fentanyl, even if formally irrelevant, do not warrant reversal, especially under the governing plain error standard. To constitute reversible error absent an objection at trial, prosecutorial misconduct must not only be improper, but also "flagrant." *Cleveland*, 907 F.3d at 438. Whether misconduct is "flagrant" depends upon a number of factors, including "whether the statements tended to mislead the jury or prejudice the defendant." *Id.* Our analysis in *Cleveland* is on point and dispositive:

> [W]e have also rejected a defendant's claim that a prosecutor's statement during closing argument regarding preventing poison from entering the community misled the jury or prejudiced the defendant. *See United States v. Scott*, 716 F. App'x 477, 487 (6th Cir. 2017). Similarly, here, we are not persuaded that the government's statements misled the jury or prejudiced the defendant. The statement was not a request "to send a message." *Id.* Instead, the government was referencing the common fact that drugs are a community problem without asking the jury to fix or combat that problem through a verdict. *Id.* (holding that the government "was accurately describing facts" when referring to the drugs as poison). In other words, the government's statement does not rise to the level of "do your duty" and/or "send a message with your verdict" comments that may constitute prosecutorial

misconduct because nothing in the government's statement requested the jury to act in a particular manner.

907 F.3d at 438.

The instant case accordingly stands in contrast to *United States v. Solivan*, 937 F.2d 1146, 1153 (6th Cir. 1991), relied upon by Meadows, where "the effect of the prosecutor's comments was to suggest to the jury that, because of defendant's participation in the drug trade in northern Kentucky, the drug problem facing the jurors' community would continue if they did not convict her." Speaking to the jury during closing argument, the prosecutor in *Solivan* said, "I'm asking you to tell [the defendant] and all of the other drug dealers like her that we don't want that stuff in Northern Kentucky . . . ." *Id.* at 1148 (internal parenthesis omitted).

Because the prosecutor's comments were not flagrant, and because defendant did not object to those comments at trial, defendant's prosecutorial misconduct claim on this basis must fail.

Meadows' third and final prosecutorial misconduct argument is that the prosecutor improperly bolstered witness testimony. This argument, too, lacks merit. "Bolstering occurs when the prosecutor implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury." *United States v. Francis*, 170 F.3d 546, 551 (6th Cir. 1999). Meadows points to two instances in which he says bolstering occurred. The first is when the prosecutor gave an overview of special agent Henderhan's anticipated testimony during the opening statement. The prosecutor mentioned that Henderhan had gathered "intelligence" during the course of his investigation but did not elaborate on what that "intelligence" was. The relevant passage from the trial transcript is as follows:

> [Henderhan] will tell you that he had opened an investigation into Mr. Meadows, and as part of that investigation he stopped and obtained a federal search warrant for Mr. Meadows' residence down in Canton, Ohio. He will tell you that that search warrant authorized him to search that residence and Mr. Meadows' vehicles for

evidence of drug trafficking related to Fentanyl, heroin, firearms possession and other evidence of drug trafficking in that residence and vehicle.

You'll hear that on June 18th of 2018, Special Agent Henderhan, *based upon the intelligence he gathered in his investigation*, he sought out Mr. Meadows when he knew that he would be at work. You'll learn that Mr. Meadows had a job where he was working as a truck driver for a company up in Akron, Ohio.

(emphasis added). According to Meadows, the prosecutor's use of the term "intelligence" was an allusion to evidence Henderhan had accumulated about Meadows' involvement in drug trafficking, but which was not known to the jury. But this is not an accurate representation of what the prosecutor stated at trial. As the excerpted passage indicates, the word "intelligence" was referring to the surveillance Henderhan had done on Meadows' home and vehicle. That surveillance was done not to determine whether Meadows was engaged in drug trafficking but instead to gather information that would allow officers to safely conduct the narcotics search. Indeed, the prosecutor proceeded to asked Henderhan a series of questions about the surveillance he had done on Meadows' home and vehicle in the context of the agent's preparation for executing the search warrant. Henderhan answered that he learned from this surveillance where and when Meadows worked so as to meet with Meadows and obtain a key from him before entering his home.[4]

The second instance of purported bolstering occurred when the prosecutor asked a rhetorical question during closing argument, which Meadows says implied that the Government's witnesses should be believed because of their expertise in law enforcement. Once again, Meadows mischaracterizes the prosecutor's statement. The rhetorical question Meadows identifies—

[4] Meadows also notes in passing that "Henderhan testified that he determined from 'sources' and 'information' (which 'sources' and 'information' were never disclosed to the jury whose trustworthiness could never be evaluated) that Meadows was trafficking in heroin and drugs, and Henderhan obtained a search warrant. Id., PageID 617." As the Government points out, the terms "sources" and "information" do not appear on the transcript page Meadows cites. Henderhan does use the term "sources" in testimony that appears ten pages after the one cited by Meadows. But in that part of his testimony, Henderhan was discussing the reasons why officers wanted to speak with Meadows and obtain a key to his house before executing the search warrant. Henderhan explained that, in general, officers try to execute search warrants in a "very low-key manner" in order to lessen the likelihood that "sources or suppliers," who officers may also be trying to arrest, do not get wind of the investigation. Henderhan was thus discussing "sources" in the abstract rather than any who may have been part of Meadows' case.

"[t]hey're the experts, right?"—came when the prosecutor was describing how Henderhan and

Callahan acquired their knowledge of the drug trade. One of the ways in which they did so, the

prosecutor said, was by speaking with drug dealers who were apprehended and who decided to

cooperate:

> Once again, why was Detective Callahan brought in? What does he see in his experience in those thousands of drug trafficking search warrants that he's done, what does he see? In those investigations when he arrests someone that's caught with drugs and they're drug trafficking, what did he tell you he does? Gathers intelligence.
>
> Sometimes they cooperate, just like [Meadows] was given the opportunity to.
>
> You think law enforcement learns a little bit about that from them? *They're the experts, right?*
>
> And [Callahan] tells you "We've learned they keep these firearms ready at hand so that they can access them because they're targets."
>
> So all those things Detective Callahan is telling you from his real life experience and Special Agent Henderhan are telling you from their real life experience, you see those in the jury instructions, that's what the law is.

When considered in context, the question "[t]hey're the experts, right?" most logically referred to

the expertise of drug traffickers, not that of Callahan and Henderhan.

In short, when characterized properly, the statements Meadows claims bolstered witness

testimony turn out to be benign. In any event, Meadows has not demonstrated, let alone argued,

that these isolated remarks prejudiced him. He has thus failed to meet his burden under the plain

error standard.

Unable to succeed on any of his claims individually, Meadows submits that the cumulative

effect of the errors at his trial deprived him of due process and thus require reversal. First, a

combination of non-errors cannot amount to cumulative error. *United States v. Deitz*, 577 F.3d

672, 697 (6th Cir. 2009). To be sure, at some points above we have assumed error but

demonstrated that it was not prejudicial. While "the cumulative effect of errors that are harmless

by themselves can be so prejudicial as to warrant a new trial," *United States v. Adams*, 722 F.3d

788, 832 (6th Cir. 2013) (quoting *United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012)), that is not the case here. The assumed errors in question generally consisted of stray remarks that did not permeate the entire trial. In deciding claims of cumulative error, we have recognized the need to "guard against the magnification on appeal of instances which were of little importance in their setting." *United States v. Cobleigh*, 75 F.3d 242, 250 (6th Cir. 1996) (quoting *United States v. Ashworth*, 836 F.2d 260, 268 (6th Cir. 1988)). Defendant has not shown how the non-prejudicial error assumed in this case would somehow become cumulatively prejudicial.

Finally, Meadows' claim that he was deprived of the effective assistance of counsel is not properly before us and instead is better brought as part of a collateral attack under 28 U.S.C. § 2255. "Ordinarily, we do not review claims of ineffective assistance of counsel on direct appeal." *United States v. Combs*, 369 F.3d 925, 940 (6th Cir. 2004) (quoting *United States v. Shabazz*, 263 F.3d 603, 612 (6th Cir. 2001)). There is a narrow exception for when "the record is adequate to assess the merits of the defendant's allegations." *United States v. Wunder*, 919 F.2d 34, 37 (6th Cir. 1990). This exception is not applicable here, however, as the record is not sufficiently developed to evaluate the reasonableness of trial counsel's decisions not to object to the statements and testimony Meadows says were improper.

The judgment of the district court is affirmed.